Filed 7/9/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S105857 |
| v. | ) | |
| | ) | |
| LUMORD JOHNSON, | ) | Riverside County |
| | ) | Super. Ct. No. CR66248 |
| Defendant and Appellant. | ) | |
| _____ | ) | |

A jury found Lumord Johnson, defendant, guilty of the first degree murder of Martin Campos by personal use of a firearm (count 1).  (Pen. Code, §§ 187, subd. (a), 12022, subd. (a)(1), 12022.5, subd. (a).)[1]  The jury also found defendant guilty of the second degree murder of Camerina Lopez by personal use of a firearm (count 2). (§§ 187, subd. (a) 189, 12022.5, subd. (a).)  The jury further found true the special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)), and that defendant committed Campos's murder while engaged in the commission of a robbery (§ 190.2, subd. (a)(17)(A)), and a kidnapping and kidnapping for robbery (§ 190.2, subd. (a)(17)(B)).  The jury additionally found true that defendant was previously convicted of a serious or violent felony, manslaughter.  (§§ 667, subds. (c), (e), 1170.12, subd. (c)), 667, subd. (a).)[2]  After the penalty phase, the jury was unable to reach a

---

[1]    Hereafter, undesignated statutory references are to the Penal Code.

[2]    In the same proceeding, codefendant Todd Brightmon was tried before a separate jury for his role in the Campos murder. That jury convicted him of first degree murder with true findings on the kidnap and robbery special circumstances as well as a vicarious

*Footnote continued on next page*

1

verdict on penalty. The trial court impaneled a new jury, which fixed the penalty at death after a second penalty trial. The court sentenced defendant to death on both murder counts and stayed execution of the prior conviction and firearms enhancements by stipulation of the parties.

This appeal is automatic. (§ 1239, subd. (b).) We reverse the judgment of death as to the Lopez murder because death is not an authorized sentence for second degree murder. We also set aside the kidnap-murder special-circumstance finding due to instructional error, but we affirm the judgment in all other aspects.

## I. FACTS AND PROCEEDINGS

### A. Guilt Phase

#### 1. The killing of Camerina Lopez

##### a. Prosecution's case

At the time of her death, Camerina "Candy" Lopez had been dating Jose Alvarez. Lopez knew defendant, whose nickname was "Lamar," from the Casa Blanca neighborhood in Riverside. She lived a few houses away from the residence of Valerie Williams, an elderly woman whose live-in caretaker, Deborah Galloway, was defendant's aunt. Defendant visited his aunt often.

On June 25, 1994, Alvarez drove past Williams's house and saw defendant standing outside it. According to Alvarez, defendant expressed displeasure at him driving in the area and told him to "keep on going straight." Alvarez angrily exchanged

---

*Footnote continued from previous page*

arming enhancement within the meaning of section 12022, subdivision (a)(1). Brightmon was sentenced to life without possibility of parole and a determinate term of five years in state prison. Brightmon was also a witness to the Lopez murder.

profanities with defendant through the open driver's side window. Defendant told Alvarez to get out of the car, but Alvarez drove home.

About half an hour later, Alvarez called Lopez, told her what happened, and described defendant. Subsequently, Alvarez picked up Lopez from her home, and they went to the store and the park.

A few hours after that, as Alvarez drove Lopez home, he saw defendant on the porch of Williams's house again and pointed him out to Lopez. Lopez asked Alvarez to stop. Lopez opened her passenger door and tried to talk to defendant. Alvarez got out and walked around the car. With his hands open, Alvarez said, "What's up?"

In response, defendant grabbed a shotgun from the porch and ran toward Alvarez. Defendant then struck him on the side of the head with the butt of the shotgun, which caused a bleeding laceration. As the men struggled over the gun, Lopez exited the car. Alvarez told her to get back in the car, but she approached and stood next to Alvarez, who was now facing defendant. Defendant had one hand on the handle of the shotgun and the other hand on its barrel, which was slightly raised and positioned across his chest.

Defendant then moved the gun very quickly in front of him. Alvarez looked at Lopez and tried to push her away as she stepped toward defendant. Alvarez heard a gunshot and saw Lopez drop onto the street. Defendant fled towards Williams's house. As she lay in the street bleeding, Lopez cried for help and said, "He shot me."

Defendant's aunt, Galloway, and his friend, Todd Brightmon, witnessed the shooting and gave a similar account. It appeared to both of them that Lopez had positioned herself between defendant and Alvarez and was trying to separate them when she was shot. Galloway heard defendant yell out, "Todd" shortly after the shooting and did not see defendant again.

A bystander flagged down a California Highway Patrol officer, who responded to the shooting scene. As Lopez lay on the ground, bleeding and apparently in great pain,

3

Lopez said "Lamar" or "Lamar Johnson" shot her, described defendant, and indicated that defendant lived in or frequented Williams's house.

Lopez was transported to Riverside Community Hospital. At the hospital, she told another officer that she and Alvarez were standing next to the car when Lamar approached them with a shotgun and started an argument with Alvarez. According to Lopez, when Lamar pointed the shotgun at Alvarez, she stepped in between them to prevent Lamar from shooting him, and Lamar shot once. Lopez died in surgery that night.

Officers searched the Williams house but did not find defendant. Defendant's aunt told an officer that defendant had run out the back door of the house. In the backyard, officers found a 12-gauge Winchester shotgun lying on the dirt. The shotgun had one expended shell inside, and the magazine contained three additional live rounds.

Dr. Joseph Choi, the forensic pathologist who conducted an autopsy on Lopez, determined that she had died from a single shotgun wound to her chest. Shotgun wad and hundreds of shotgun pellets were found inside Lopez's chest and abdomen. The pellets penetrated Lopez's diaphragm, damaging the liver and perforating the vena cava and right kidney. Because of the presence of unburned gunpowder, the appearance of the wound, the presence of wadding inside the wound, the absence of individual pellet holes, and the absence of soot, Dr. Choi concluded the gun was fired at relatively close range, between six inches and two feet away.

The prosecution's firearms expert determined that the shot pellets and wadding removed from Lopez's body were consistent with those inside the unexpended shells found in the shotgun recovered from Williams's backyard. He also determined that the force required to pull the trigger on that shotgun was normal and not excessively heavy or light for a typical shotgun.

### b. Defense case

Defendant's friend, Todd Brightmon, described the events leading to the shooting of Lopez, giving testimony mostly consistent with the accounts given by Alvarez. He believed that the shooting was an accident. Brightmon admitted, however, that he had initially told the police that he was not at the scene of the Lopez killing because he did not want to become involved.

### 2. The killing of Martin Campos

### a. Prosecution's case

Oscar Ross is the uncle of defendant's wife and a cousin of Brightmon.[3] Ross owned a large parcel of property cluttered with junk and several trailers in Riverside County. Because of a prior shooting incident, Ross used a wheelchair. His caretaker, Margie Escalera, lived in a nearby trailer.

Ross had been friends with Martin Campos and frequently purchased cocaine and marijuana from him. Ross would then resell the cocaine to other sellers. At one point, Ross suspected that Campos had arranged a robbery in which four or five Spanish-speaking men accosted Ross and Escalera at gunpoint, taking approximately $4,500 in cash, a few pounds of marijuana, and some household items.

Ross did not confront Campos with his suspicions, but instead formulated a plan with defendant, who remained at large after the Lopez shooting, and Brightmon to steal cocaine from Campos. Ross planned to offer Campos $22,500 for a kilo of cocaine; upon delivery, he would confront Campos about the prior robbery and, using defendant and

---

[3] Ross had originally been charged as a codefendant in the killing of Campos, but before trial he pleaded guilty to second degree murder and received a 15-year-to-life term. Ross agreed to testify truthfully in this case, and the prosecutor agreed to write a letter in support of placing Ross on parole when he became eligible.

5

Brightmon to intimidate him, take the cocaine without paying for it. Ross claimed he did not intend to harm or kill Campos.

Ross contacted Campos and arranged for the delivery. The night before, defendant and Brightmon joined Ross and Escalera for dinner. That evening, defendant said that killing someone "comes easy."

The following morning, on November 11, 1995, defendant and Brightmon waited at Ross's property. Campos had purchased the kilo of cocaine from Jose Garcia, and Garcia drove him to Ross's property with the cocaine concealed inside the trunk of his white Nissan.

When Campos and Garcia arrived, Ross was in the yard. To ease any suspicion, defendant and Brightmon pretended to rake the yard. Garcia parked his car, and Campos got out to speak with Ross near a U-Haul truck. Garcia got out of his car and approached the others.

Ross asked to see the cocaine, and Campos told Garcia to get it. As Garcia walked toward his car, Ross was about to tell Campos "what was getting ready to go down" when defendant pulled out a handgun and pointed it at Campos, who was seated on the bumper of the U-Haul.

Garcia saw what was happening and ran toward the gate. But Brightmon chased after and tackled him, dragging him back to the U-Haul truck. Ross, defendant, and Brightmon told Campos and Garcia to get inside the U-Haul. Campos refused, but was forced inside. Brightmon struck Garcia in the face, causing him to fall inside as well.

Campos jumped out of the U-Haul truck and ran, with defendant and Brightmon giving chase. Defendant caught up with Campos and began struggling with him while Brightmon stood nearby. Ross saw Campos either break loose from defendant or be thrown to the ground, at which point defendant shot Campos with the handgun. Ross's caretaker, Escalera, also saw the shooting from her trailer window.

6

Garcia heard the shot and jumped out of the U-Haul truck into a nearby trash container.  He briefly saw Campos slouched over with defendant standing about 10 feet in front of him.  Campos said, "No, man.  No, man," and fell to the ground.  Garcia jumped the fence and fled Ross's property.  Campos tried to crawl on his stomach toward Garcia's car while defendant continued to stand over him with the handgun.  Ross, defendant, and Brightmon searched Garcia's car for the cocaine, but could not find it.  Meanwhile, Campos lay on the ground, still breathing, and looking at Ross.

Ross believed that defendant and Brightmon placed Campos, while still alive, in the trunk of Garcia's car and closed the lid.  Escalera, however, said that some unknown African-American men later arrived and lifted Campos into the trunk of a white car, and that the same men pushed that white car off Ross's property with another vehicle.

After Campos was placed in the trunk, defendant ran toward the front gate, leaving Brightmon and Ross behind.  Defendant encountered a resident of Ross's property, Ronnie Raynold Moore, who had heard the gunshot and was trying to drive off the property with his son.  Defendant approached Moore's car with the gun pointed downward and said, "Don't go nowhere."  Defendant got in the passenger seat with his gun on his lap pointed toward Moore and told Moore to drive him off the property.  Defendant directed Moore to drive around for 30 to 60 minutes.  When defendant attempted to share his thoughts, Moore told him he did not want to hear anything.  When defendant eventually told Moore to stop, he apologized, gave him $30, and left Moore's car.

Ross drove Escalera and Brightmon out of the yard.  He dropped Brightmon off and spent the night with Escalera at a cousin's home.

After fleeing Ross's property, Garcia went to Campos's home and met his brother, Raul Campos.  They searched for Campos and eventually found Garcia's car about a mile away from Ross's property.  They drove it to Garcia's home and returned to Campos's

7

home where Raul called the police. Raul did not tell the police anything about the cocaine.

Deputy Sheriff Michael Angeli, Garcia, and Raul investigated Ross's property. Deputy Angeli found fresh tire tracks left by a small car leading away from a locked gate. He also found drag marks with coagulated blood, blood spatter in the dirt near Ross's Cadillac, and blood at other adjacent locations. But Deputy Angeli found no dead or injured person on the property.

The next morning, Garcia opened the trunk of his car and discovered Campos's dead body. He did not want to be blamed for Campos's death so he drove away from his home and dumped the body off the side of the road onto an embankment. A passerby eventually discovered the body and contacted the Sheriff's department.

The forensic pathologist who performed an autopsy on Campos determined that he had died from a single gunshot wound that entered the right upper chest near the armpit. The bullet had struck and broken the fifth rib, then fragmented, perforated the right lung and heart, and passed between the back of the fifth and sixth left ribs. The pathologist believed Campos could have survived a minute or two before blood loss and aspiration of blood caused his death.

### b. Defense case

Defendant presented an alibi defense, claiming that he was in Oklahoma at the time of the Campos murder.

Defendant's cousin, Francisco Trotter, and Trotter's girlfriend, Roberta McConnell, lived in Oklahoma. Between January and November of 1995, Trotter often socialized with defendant in Tulsa. Trotter and McConnell testified that defendant was at Trotter's apartment on the morning of November 11, 1995, the day Campos was killed. The day was memorable for Trotter and McConnell because it was Veterans Day, and they went to a cemetery to place a flag on Trotter's father's grave.

8

Brightmon testified and described the events leading to Campos's killing. In his version of events, defendant was not involved. Instead, Brightmon testified that Ross had asked Brightmon to stay and monitor the drug transaction with Campos as protection and gave him a revolver. After Garcia and Campos arrived, Ross and Campos spoke to each other in front of the car for a few minutes, and Brightmon noticed a truck driving into the area. Suddenly, Ross said something about a "jack" and, because Brightmon saw a group of Hispanic men running toward him, he took out the gun. Campos and Brightmon briefly struggled, and they both fell, causing the gun to fire, hitting Campos. Ross told Brightmon to help him "clean up this shit," or he would be shot too. According to Brightmon, Ross told him to blame the shooting on defendant because Ross did not like him. Brightmon claimed he was scared of Ross because Ross had money to have people killed.

During his testimony, Brightmon claimed he lied in his prior police statements, in which he blamed the shooting on defendant, in order to protect himself. When he and defendant were in custody for the present offenses, Brightmon sent a letter to defendant's attorney in which he offered to testify that he was the person who shot Campos.

### B. Penalty Phase

#### 1. Prosecution's case in aggravation

##### a. Victim impact evidence

Camerina Lopez was 34 years old when she was killed. Lopez's mother, Socorro Roman described the loss, pain, and grief the family suffered as a result of her daughter's untimely death.

Martin Campos was 33 years old when he was killed. Gladys Felipe, the mother of Campos's children, testified about Campos's relationship with her and the children, family activities, and their future plans. Campos had always been the center of family gatherings, and his death left a huge void at family events.

9

### b. Prior aggravating conduct

#### (1) The killing of Norbert O. Estrada

In March 1983, 25-year-old Norbert O. Estrada went to a market in Riverside. Defendant approached Estrada and offered to sell him marijuana. Defendant and Estrada began to argue. When Estrada took a combative stance, suggesting he was prepared to fight, defendant left. Defendant later returned. As Estrada stood up, defendant pulled a pistol from his waistband and fired three to five shots at Estrada, killing him. Estrada had been unarmed. Defendant then fled. Defendant turned himself in to the police a few days after the shooting. He admitted that he had been involved in the incident, but asserted it was an accident and self-defense. Police did not notice any injuries on defendant. Defendant was convicted of voluntary manslaughter.

#### (2) The shooting of Nigel Hider

In February 1989, Nigel Hider, an active gang member in the Gardena Payback Crips, was standing in front of a house in Riverside when a truck pulled up and someone inside the vehicle started firing at him. Hider was initially uncooperative with police and reluctant to identify the shooter, but eventually told the detective that defendant shot him. Angela McCurdy was with Hider when he was shot, and, in 2000, she told an investigator that she had seen a muzzle flash from a car fired by a Black male with a bald head, but she could not say for certain whether the shooter was defendant.

At the penalty phase retrial, however, Hider testified that he never said defendant shot him and that he had identified the shooter as a White person. In her testimony, McCurdy denied seeing the shooting or telling the contrary to an investigator.

The prosecution also presented evidence that, approximately one month before Hider was shot, defendant bragged to an officer that he had single-handedly expelled the Gardena Payback Crips gang from the Casa Blanca neighborhood.

10

*(3) Motel shooting and assault*

Anita Smith testified that in January 1992 she was staying at a Riverside hotel with her husband, Earl Smith, and his friend, Eric Dawson. During the stay, Earl Smith argued with defendant's friend, Reginald Robinson, and they threatened to shoot each other. Defendant was not involved in the argument, but when Anita Smith was in the bathroom, someone shot Dawson in the elbow with a shotgun. She did not see who shot Dawson.

Afterward, Anita Smith went down to the parking lot where she saw defendant's vehicle starting to leave and yelled out that she had the vehicle's license plate number. According to her testimony, Robinson got out of the vehicle and pointed a shotgun at her. Defendant also got out of the vehicle and told Robinson not to shoot her, but defendant slapped Smith hard across the face after Robinson put the gun down. Robinson and defendant then drove away.

*(4) Telephoned threats*

Defendant's wife, Tina Johnson, testified that she had an affair with Jarah Smith while defendant was in jail awaiting trial on the present charges. Defendant found out about the affair and called his wife saying that he would blow up the school where she worked if she did not stop seeing Smith.

Defendant obtained the assistance of third parties to set up several calls, including five to seven calls to Smith. Smith testified that defendant in these calls said that he knew where Smith lived, and, on one occasion, said he could "have something done" to him.

*(5) Conduct while incarcerated*

In March 1986, while defendant was serving his sentence for the manslaughter of Estrada, a correctional officer found two shanks in the single-man cell occupied by defendant. In August 1986, another correctional officer saw a shank fall out of

11

defendant's pocket when he was playing basketball. The shank was a round piece of plastic tapered to a point and capable of inflicting a stab wound.

As additional aggravating evidence, the prosecutor presented testimony concerning defendant's assaults against six other inmates while housed in San Quentin State Prison, California State Prison, Corcoran, and Riverside County jail.

### 2. *Defense case in mitigation*

#### a. *Family background*

Forensic psychologist Gretchen White described three aspects of defendant's childhood that she believed had a very significant effect on him: family instability, the lack of a real father, and physical and emotional violence in the home. According to Dr. White, by the time he was six years old, defendant had lived with three different men and had never met his real father. Dr. White explained that the family lived in at least 17 different places throughout his childhood and that defendant attended four different elementary schools and four different middle schools. Dr. White specifically believed defendant's abusive childhood caused him to overperceive threats and overreact.

Defendant's mother, Joe Ann Johnson, testified that defendant's father was Leroy Brown. She and Brown never married, and Brown never became a part of defendant's life. When defendant was six or seven years old, Joe Ann moved in with James Johnson. Joe Ann eventually married James and gave defendant his last name. James was a father figure for whom defendant appeared to have affection. But James was an alcoholic and abusive when he drank. James was physically and mentally abusive to Joe Ann and the children, especially defendant's three sisters. Defendant sometimes tried to intervene, but on some of those occasions, James would hit defendant.

When defendant was 15 or 16 years old, Joe Ann ended her marriage. After Joe Ann hurt her back and could no longer work, defendant dropped out of high school and took a job to support the family. Defendant did not get into trouble until he was

12

convicted of voluntary manslaughter in 1983. After defendant left prison, he began dating Tina and married her five or six years later in 1992.

### b. Defendant's good character

Various relatives and friends testified that defendant and Tina had a strong, wonderful, and happy marriage, that he was a loving husband and father who always provided for his family, and that he had good relationships with other relatives and other children. They claimed defendant was a good father and never violent or abusive with his wife or children. Tina and the children visited defendant two or three times a week while he was in custody. Defendant continued to take an interest in and advise his children and help them with schooling. Several of defendant's cellmates at Riverside County jail between 1997 and the 2001 penalty phase retrial testified that defendant was a good cellmate, friendly and polite, and had good rapport with jail staff.

### c. Institutional history

In order to mitigate defendant's violent conduct during his prior incarcerations, defendant presented testimony concerning his placement in an adult prison and the conditions in that facility.

The original prosecutor in the Estrada manslaughter case testified that, because defendant was 18 years old at the time of his sentencing, defendant was eligible for placement in the former California Youth Authority (CYA), which focused on rehabilitation rather than punishment. But the trial court refused, instead housing him as an adult in the former Department of Corrections (CDC), which was at the time an unusual sentence for defendants under the age of 21.

According to William Riggs, who worked for the CDC for approximately 17 years, the facility where defendant was placed, California State Prison, Corcoran, was one of the worst prisons in the state and "extremely violent": between 1989 and 1999 more inmates were shot and killed in Corcoran than all other prisons in the United States

13

combined. Riggs explained that a prisoner who had four fights in 13 months would be regarded as a relatively well-behaved inmate. It was impossible for prisoners to avoid fights and survive. Younger looking prisoners such as defendant were particularly vulnerable and subject to predators.

## II. PRETRIAL ISSUES

### A. Motion to sever

Defendant contends the trial court erred by denying his motion to sever the Lopez and Campos murder charges. He argues that severance was warranted because evidence in the cases was not cross-admissible and both cases were weak, creating a substantial risk that the jury would convict based upon the spillover effect of the aggregate evidence. He claims the error violated his state and federal constitutional rights to a fair trial, due process, and reliable jury verdicts. The trial court did not abuse its discretion in denying defendant's motion to sever.

Section 954 governs the joinder of charges: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . . ."

Accordingly, when the charged offenses are of the same class, such as the murders charged here, they meet the statutory requirements for joinder. (*People v. Kraft* (2000) 23 Cal.4th 978, 1030.) "Because consolidation ordinarily promotes efficiency, the law prefers it." (*People v. Ochoa* (1998) 19 Cal.4th 353, 409; accord, *People v. Soper* (2009) 45 Cal.4th 759, 772 (*Soper*).) In reviewing whether the trial court improperly denied a defendant's motion to sever, " 'we apply the familiar standard of review providing that the trial court's ruling may be reversed only if the court has abused its discretion. [Citations.] An abuse of discretion may be found when the trial court's ruling " 'falls

14

outside the bounds of reason.' " ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1153, quoting *People v. Osband* (1996) 13 Cal.4th 622, 666.)  Defendant has the burden of showing error in denial of a motion to sever and does so only on a clear showing of prejudice to establish the trial court abused its discretion.  (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.)

Refusal to sever can be an abuse of discretion where " ' "(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case." ' " (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1030, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

Concerning the issue of cross-admissibility, a "lack of cross-admissibility is not, by itself, sufficient to show prejudice and bar joinder." (*People v. Stitely* (2005) 35 Cal.4th 514, 532; see § 954.1 ["evidence concerning . . . offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact"].)  We examine whether defendant was prejudiced because of joinder by determining if evidence of each of the joined charges would have been admissible in separate trials on the others.  "If so, any inference of prejudice is dispelled." (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1030.)

Defendant argues that the evidence would not have been admissible in separate trials.  Specifically, he claims that evidence concerning a statement defendant made to Oscar Ross was not admissible in both trials.

15

The statement at issue was defendant's admission to Oscar Ross before the Campos killing that he thought it was "easier to kill someone the second time" —an apparent reference to the killing of Lopez.[4] We assume, without deciding, that defendant's statement was not admissible as to the Lopez case. But, in any event, the absence of cross-admissibility cannot alone establish the substantial prejudice necessary to make severance mandatory. (*People v. Scott* (2011) 52 Cal.4th 452, 473; *Soper*, *supra*, 45 Cal.4th at pp. 779-783; *People v. Smallwood* (1986) 42 Cal.3d 415, 426).

More important, we further observe that none of the three remaining factors concerning severance supports defendant's arguments.

First, neither killing was likely to inflame the jury against defendant. Both homicides involved a victim killed by a gunshot and defendant fled the scene on both occasions. (*Soper*, *supra*, 45 Cal.4th at p. 780.) Based on the jury's verdict, the Lopez shooting may have been accidental, thereby lessening its potential for inflammatory influence.

Second, neither charge amounted to a weak case that was bolstered by joining it with a stronger one. Several witnesses placed defendant at both homicides, and there were eyewitnesses who saw and heard the fatal shots. Defendant's intent and willingness to kill was evidenced by his possession of a loaded firearm in both crimes and his statement to Ross before the Campos shooting. Although defendant presented an alibi defense to the Campos killing, a mere imbalance in the evidence between the joined

---

[4] In this statement, defendant evidently was referencing his killings of Norberto Estrada in 1983 and of Lopez in 1994, with the Lopez killing being the "second time." The trial court edited this statement at trial to remove the reference to "second time" so as not to allow the guilt phase jurors to infer that defendant had also killed someone before Lopez.

16

crimes does not signal a risk that one charge will be prejudicially bolstered. (*Soper*, *supra*, 45 Cal.4th at p. 781.)

Third, joinder of the two killings did not convert the matter into a capital offense because the Campos case included two kidnapping and robbery special circumstance allegations and thus made defendant eligible for the death penalty. The addition of the multiple-murder special circumstance did not convert the Campos homicide into a capital offense. If tried separately, the prosecution could have tried the Lopez matter first and then alleged the multiple-murder special circumstance in the subsequent proceedings concerning the Campos killing. (*People v. Mason* (1991) 52 Cal.3d 909, 934.)

Defendant further asserts that severance was required because he wished to testify as to the Lopez shooting and that, in a joined case, his testimony in one matter and silence about the Campos matter would have prejudiced him in front of the jury. But we have recognized that severance is not required on such grounds unless the defendant shows that he has important testimony to give concerning one charge and a strong need against testifying concerning the other charge. (*People v. Thomas* (2012) 53 Cal.4th 771, 800.) "The showing must be specific enough to permit the court to 'weigh the considerations of economy and expedient judicial administration against the defendant's interest in having a free choice with respect to testifying.' " (*Ibid*., quoting *People v. Sandoval* (1992) 4 Cal.4th 155, 174.) In the present case, defendant did not provide the trial court with a specific offer of proof concerning his testimony or why he wanted to testify in one matter and not the other. Consequently, the trial court did not abuse its discretion in failing to sever the cases on this asserted ground.

Finally, defendant argues that, even if the trial court did not abuse its discretion in denying the motion to sever at the time it was made, we should nonetheless reverse the judgment because joinder did actually result in gross unfairness in violation of his right to due process. (*People v. Rogers* (2006) 39 Cal.4th 826, 851.) He contends that, because the jury deliberations in the guilt phase lasted seven days, the verdict must have been

17

close, which defendant attributes to the prejudicial spillover effect of joinder. This argument is speculative. The length of jury deliberations in this two-homicide case, by itself, supports no conclusion as to the closeness of the case or as to any prejudicial effect of joinder. (*In re Sassounian* (1995) 9 Cal.4th 535, 548, fn. 10 [the fact that the jury deliberations were long and that the jury made several requests "does not entail a conclusion that . . . the case was close as to first degree murder"].)

Defendant has failed to show that the court's ruling denying severance was an abuse of discretion, depriving him of his constitutional right to due process of law.

**B. Asserted errors during jury selection**

Defendant claims the trial court committed error under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) by finding no purposeful discrimination based on the prosecutor's use of peremptory challenges to remove three African-American prospective jurors. He alleges the trial court did not properly engage in the third step of analysis required by *Batson/Wheeler*; that its finding of no discriminatory intent violated his state constitutional right to a trial by a jury drawn from a representative cross-section of the community; and that this allegedly biased use of peremptories violated his Sixth Amendment right to an impartial jury and his Fourteenth Amendment right to equal protection under the federal Constitution. We conclude the trial court properly denied defendant's objection to these peremptory challenges.

*1. Background*

During jury selection, the prosecutor exercised eight peremptory challenges to prospective jurors. Prospective Juror Keith B., an African-American, was the fourth of those challenges. During the selection of alternate jurors, the prosecutor exercised an additional three peremptory challenges. Prospective Alternate Jurors Vanessa H. and

18

Myra P., both African-American, were the second and third of those challenges, respectively.

Defendant made his first *Batson*/*Wheeler* objection after the prosecutor exercised his challenge to Myra P. during the selection of alternate jurors. Defense counsel argued that there was a prima facie case of discrimination because the prosecutor had used peremptory challenges to remove three of the four African-Americans called to the jury box. The trial court found the defense showing sufficient to require the prosecutor to offer valid neutral reasons for excusing the three contested prospective jurors.

The prosecutor explained that he had doubts about whether the three challenged prospective jurors could render a verdict of death. Concerning Prospective Juror Keith B., the prosecutor stated he was worried about Keith B.'s prior experience in ministering to prison inmates, which might make him lean in favor of mercy. He also emphasized that Keith B. explained during voir dire that he leaned in favor of mercy as to the death penalty. Concerning Prospective Juror Vanessa H., the prosecutor stated he was worried that she could not vote for a death verdict because of a comment she made about "[t]hou shalt not kill," her belief that her feelings did not matter, and her expressed hesitation regarding whether she could ultimately return a death verdict after months of trial. In addition, the prosecutor expressed concern over Vanessa H.'s previous service on a jury that had deadlocked and her expressed belief that the other jurors in that matter had made up their minds going into deliberations. Concerning Prospective Juror Myra P., the prosecutor noted her strong views against the death penalty and believed she would be unable to render a death verdict.

In response, defense counsel briefly stated that he believed that there were seated Caucasian jurors, Juror Nos. 4, 5, and 6, who had expressed similar hesitation concerning the death penalty but had not been challenged by the prosecutor.

After considering the prosecutor's offered reasons, the trial court concluded that the excusals of the prospective jurors in question had not been based on race, but were

19

based on legitimate reasons.  The court made clear that the prosecutor had "a legitimate peremptory challenge for each of these [prospective jurors], for good reasons, and reasons that he stated for the record."

### 2. *Applicable law*

The law governing motions alleging the discriminatory use of peremptory challenges is settled.  "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.]  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'  [Citation.]"  (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)

Here, the trial court explicitly found that a prima facie showing of a discriminatory purpose had been made, and the prosecutor explicitly volunteered his actual reasons for the contested peremptory challenges.  We, therefore, are concerned with the third stage of the *Batson/Wheeler* analysis.[5]  Regarding such a third-stage inquiry, our review of a trial court's denial of a *Batson*/*Wheeler* motion is deferential; we examine "only whether substantial evidence supports its conclusions."  (*Lenix*, *supra*, 44 Cal.4th at p. 613.)  The identical standard applies to a comparative juror analysis.  (*Id*. at p. 627.)  "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great

---

[5]    Defendant claims the trial court failed to engage in a third-stage analysis when it denied the *Batson*/*Wheeler* motion.  But the court did engage in a third-stage analysis, as reflected in its statement that it had considered and agreed with the reasons given by the prosecutor.  (*People v. Lenix* (2008) 44 Cal.4th 602, 614, fn. 9 (*Lenix*).)

deference to the trial court's ability to distinguish bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.)  As long "as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal."  (*Ibid.*)

"[T]he critical question in determining whether a prisoner has proved purposeful discrimination" in connection with a third-stage inquiry "is the persuasiveness of the prosecutor's justification for his peremptory strike.  At this stage, 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'  [Citation.]  In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."  (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 338-339, quoting *Purkett v. Elem* (1995) 514 U.S. 765, 768.)

We also will consider defendant's claims concerning the selection of alternate jurors because an alternate juror ultimately served on his jury.  (Cf. *People v. Roldan* (2005) 35 Cal.4th 646, 703.)

With the foregoing principles in mind, we now discuss each of the three peremptory challenges at issue.

> 3. *The prosecutor had valid neutral reasons for removing Prospective Jurors Keith B., Vanessa H., and Myra P.*

> a. *Prospective Juror Keith B.*

The prosecutor explained that he challenged Prospective Juror Keith B. because of his stated bias against the death penalty and his tendency toward mercy.  The record supports that assertion.  Keith B. had written in his questionnaire that he was mildly in favor of the death penalty by rating himself a "seven" on a 10-point scale concerning the strength of his support for the death penalty, and indicated that it was "legitimate" as

21

"prescribed by law."  But he further clarified that he "lean[ed] on the side of mercy" and that his "orientation is Christian, hence one of grace."  When asked how his views have changed over time concerning the death penalty, Keith B. wrote, "more toward mercy."  Moreover, in answering the question of whether he thought death or life in prison was the more severe punishment, Keith B. wrote, "death is so final" and that "errors and malpractice" can occur.  He further wrote, "a defendant can be redeemed" and "victims can reconcile."  Similarly, on voir dire, Keith B. explained that he could realistically see himself returning a verdict of death, but that he leaned in favor of mercy and, depending on the circumstances, he "would tend to consider a lesser penalty."  He also played an active role in rehabilitating inmates by serving as a minister in correctional facilities.  Keith B.'s expressed preference for leniency constituted a neutral basis for the prosecutor to doubt his ability to return a verdict of death.

### b. Prospective Alternate Juror Vanessa H.

The prosecutor claimed he excused Prospective Alternate Juror Vanessa H. because of her statements during voir dire concerning the death penalty and because she had served on a jury that was unable to reach a verdict.  These assertions are also supported by the record.  In her written questionnaire, Vanessa H. rated herself a "five" on a 10-point scale concerning the strength of her support for the death penalty, and she further wrote, "I feel if you think the death penalty is a good thing to have in this state, I'm not against it, and I think my feelings don't count."  During voir dire, the prosecutor asked Vanessa H. to clarify what she meant about her feelings not counting.  She explained that "because the way the world is now and the way people make decisions on a lot of things, they [are] not basing . . . the decision on what's in the world today" but instead "on how they feel."  She further stated that she thought that "Especially African-American opinions, it really don't count on how I feel about the death penalty."

22

When asked more directly about whether she could return a verdict of death, Vanessa H. gave conflicting responses. First, she stated that she did not "really have an opinion on the death [penalty]" because she "never came to that situation." Then, Vanessa H. stated, "Based on my religion — I believe in Jesus Christ. According to him, you shouldn't kill . . .'Thou shalt not kill.' " She further said, "But if it was to be based on the evidence and special circumstances, I can look at it both ways."

Later, however, the prosecutor presented Vanessa H. with a hypothetical scenario in which someone was found guilty beyond a reasonable doubt with aggravating circumstances substantially outweighing mitigating circumstances "and you think the just and necessary verdict is death," and asked whether she could return such a verdict.[6] Vanessa H. responded, "I can't answer that question two months down the road" because she thinks "about everyday life" and goes "day by day." She clarified that she would have to look at all the evidence and circumstances first. In response, the prosecutor asked Vanessa H. more directly if she could imagine coming into the courtroom two months later and saying, "I voted to have you executed." Vanessa H. continued to refuse to directly answer the question, saying, "I probably can, and I probably can't" and that she could not answer the question "until it comes to that time." Vanessa H. further

---

[6] The prosecutor used the above-described hypothetical for numerous prospective jurors. We recognize that the standard instructions in CALJIC No. 8.88 do not speak in terms of whether jurors must believe that a verdict of death is "just and necessary." Instead, we instruct penalty phase jurors that, "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (CALJIC No. 8.88.) It appears that the prosecutor used this "just and necessary" phrasing in his hypothetical to determine whether a prospective juror could actually return a verdict of death where the circumstances would otherwise warrant such a sentence in the prospective juror's mind. Our subsequent references to this phrase are not intended to alter our standard instructions.

elaborated that if she weighed the evidence and it showed that defendant should be put to death, she thought she could make such a decision, but that she was "not going to give you an answer like 'Yeah' right now" because she did not know yet, "[b]ut I think I can."

When posed with the scenario in which Vanessa H. agreed that the hypothetical evidence and circumstances would support a verdict of death, she expressed considerable confusion and hesitation as to whether she could actually deliver such a verdict. This afforded the prosecutor with a valid, neutral reason to excuse her. (*People v. Hoyos* (2007) 41 Cal.4th 872, 902 ["That a juror is equivocal about his or her ability to impose the death penalty is relevant to a challenge for cause, but does not undercut the race-neutral basis for a prosecutor's decision to excuse a prospective juror peremptorily"].)

In addition, Vanessa H. described in negative terms her past experience on a civil jury that failed to reach a verdict. She complained that the other jurors in that case "already had the answer" before deliberations began. Vanessa H. claimed that the jurors were not listening to each other and were basing their decision on emotions rather than on the evidence. Prior service on a deadlocked jury is an accepted neutral reason for excusing a prospective juror. (*People v. Taylor* (2010) 48 Cal.4th 574, 644.)

### c. Prospective Alternate Juror Myra P.

The prosecutor also explained that he excused Prospective Alternate Juror Myra P. because of her opposition to the death penalty. Again, the record supports his contention. In her written questionnaire, Myra P. clearly and repeatedly wrote that she did not believe in the death penalty. She rated herself a "one" on a 10-point scale concerning the strength of her support for the death penalty. She further explained that she was concerned that the death penalty might result in the death of innocent persons and that a person sentenced to life, in contrast, "might have the opportunity to prove [innocence]." On voir dire, Myra P. gave some conflicting answers, but most of them showed strong reluctance toward imposing the death penalty. She first stated that she "would always go

24

for life" and that she could not see herself voting for a death sentence because she did not believe in it. She then stated that if it was proved that death was the appropriate penalty, she "could do it." The prosecutor later presented to Myra P. the same hypothetical he had posed to Vanessa H. — in which someone was found guilty with aggravating circumstances substantially outweighing mitigating circumstances "and the just and necessary verdict is death," and asked whether Myra P. could return such a verdict. Myra P. responded, "That would be very difficult for me" but "[n]ot impossible" and that the circumstances would have to be "really, really aggravating." She then explained that it was not realistic that she could return a death verdict. However, at the end of her voir dire, the prosecutor asked Myra P. whether her feelings were so strong that she would be substantially impaired in her ability to return a death verdict, and Myra P. replied that she would be "[n]ot impaired."

Even more clearly than Vanessa H., Myra P. expressed considerable doubt regarding whether she could return a verdict of death when the circumstances would otherwise warrant its application. Again, this was a valid, neutral reason for the prosecutor to excuse her. (*People v. Smith* (2005) 35 Cal.4th 334, 347-348 [a prospective juror's doubts about the death penalty can be a legitimate, race-neutral reason to exercise a peremptory challenge].)

### 4. *A comparative analysis of prospective jurors and their views on the death penalty reflects no disparate treatment based on race*

Defendant argues that a comparative juror analysis indicates that Prospective Alternate Juror Vanessa H.'s views concerning the death penalty constituted a pretextual reason for her removal because the prosecutor allegedly failed to show equal concern about several other prospective jurors who had expressed similar views and yet sat on the jury unchallenged by the prosecutor. We disagree.

Defendant identifies six impanelled jurors, Juror Nos. 1, 3, 4, 5, and 6 and Alternate Juror No. 1, as persons relevant to a comparative analysis because they all

25

acknowledged that returning a verdict of death would be difficult but that they thought they could make that decision.[7]  But none of defendant's comparisons support his claims because, unlike Prospective Juror Vanessa H., none of these jurors questioned his or her ability to vote for a sentence of death even when the circumstances and the law would warrant its application.

At best, the comparisons show that some of the seated jurors believed that deciding whether a death verdict was appropriate would be difficult and weighty. When asked whether he could return a verdict of death in a public courtroom, Juror No. 1 recognized that it would be a "really big decision" and "difficult," but stated, "I think I could [return such a verdict]."  Juror No. 3 stated that "The church teaches that all life is sacred," but there was nothing about his religious affiliation that would prevent him from returning a death verdict.  Juror No. 4 also recognized that returning a verdict of death would be difficult, but she stated, "I think I could do that."  When asked whether she could vote for a death verdict when it appeared to her that it was "just and necessary," Juror No. 5 said it was a hard question that is difficult to answer, but she thought she could do that.  When asked a similar question, Juror No. 6 stated that it would be "probably the hardest decision I've ever made," but "I think that I could."  Finally, Alternate Juror No. 1 also said she could vote for death if such a verdict was "just and necessary."

---

[7]     Defendant claims that Juror Nos. 2, 5, 8, 10, 11, and 12 should be compared to Vanessa H. because they each, like her, rated their support for the death penalty as "five" on a 10-point scale concerning the strength of their support for the death penalty.  But this comparative circumstance is largely irrelevant because Vanessa H.'s excusal was based, not on her support for the death penalty, but on whether she herself could actually return a verdict of death in court.  None of these other jurors expressed reservations similar to Vanessa H.'s during voir dire.

Accordingly, none of the instances identified by defendant supports his claim that the prosecutor exercised a peremptory challenge against Vanessa H. because of her race. Specifically, none of these compared jurors, unlike Vanessa H., expressed the reluctance to answer the question followed by the uncertainty about being able to return a verdict of death when the circumstances would otherwise warrant its application. Moreover, none of the compared jurors, unlike Vanessa H., had served on a deadlocked jury. Last, the prosecutor accepted an African-American, Juror No. 8, on the sworn jury. Although not conclusive, the fact that the jury included a member of the group allegedly discriminated against "is an indication of good faith in exercising peremptories." (*People v. Turner* (1994) 8 Cal.4th 137, 168.)

## III. GUILT PHASE ISSUES

### A. Admission of Lopez's dying declarations

Defendant argues the trial court erred in admitting Lopez's statements under the dying declaration exception to the hearsay rule on the ground their admission violated his Sixth Amendment right to confront the evidence against him, his due process right to reliability and fundamental fairness, and his Eighth Amendment right to a reliable verdict. More specifically, he claims that Lopez's statements went beyond identifying defendant as the shooter, concerned her perception of his actions and motives, and that he had no opportunity to confront them and show their unreliability. We conclude that the court properly admitted Lopez's statements.

After Lopez was shot and taken to the hospital but before she went into surgery, she gave a statement to Officer Patrick Olson in which she described the argument between defendant and Jose Alvarez. Lopez told the officer that defendant was holding a shotgun and pointed it at Alvarez during the argument. Lopez said she thought defendant was going to shoot Alvarez, so she immediately stepped between them to stop defendant from shooting. She then said that she was shot once. In addition to the statement given

27

to Officer Olson at the hospital, Lopez spoke to two officers at the crime scene, identifying defendant as the person who shot her. All three officers testified as to Lopez's statements. Two other witnesses at the crime scene, a neighbor and Lopez's brother, also testified that Lopez had identified defendant as the person who shot her.

Just before the prosecution commenced its case-in-chief, defense counsel objected to the admission of Lopez's statements on hearsay grounds, as well as on constitutional grounds under the Sixth, Eighth, and Fourteenth Amendments. The trial court made a "preliminary finding" that it "would probably" allow admission of the statements. Defense counsel also requested that the objection be deemed a continuing objection because he "hate[s] to object in front of the jury." The trial court granted the defense's request that there be a continuing objection.

During the penalty phase, defense counsel reminded the trial court that he previously had objected, on various statutory and constitutional grounds, including the Eighth and Fourteenth Amendments, to any statements that Lopez made that went beyond naming defendant as the shooter. Counsel stated, "I just want to reiterate all those same objections I made, and I suspect the court's ruling would be the same." The trial court agreed, "I think it would. The dying declarations will definitely come in. I'll overrule you on that."[8]

The Attorney General argues that defendant has forfeited this claim on appeal because he failed to renew his objection during the testimony of the witnesses who recounted Lopez's statements. But defendant's objection to Lopez's statements was

---

**8** The trial court admitted Lopez's hearsay statements as a dying declaration under Evidence Code section 1242, which states: "Evidence of a statement made by a dying person respecting the cause and circumstances of his death is not made inadmissible by the hearsay rule if the statement was made upon his personal knowledge and under a sense of immediately impending death."

28

properly preserved for appeal. In order to avoid disruption at trial, the trial court granted defense counsel's motion for a continuing objection to all such testimony introduced at trial, which indicates that the court understood that the defense opposed the introduction of this evidence. (*People v. Banks* (2014) 59 Cal.4th 1113, 1165 [it was not incumbent upon defense counsel to disrupt the trial by continuing to object to each subsequent question in order to preserve the objection].) Defense counsel again raised the issue at the penalty phase, and the court affirmed its prior decision. Consequently, defendant did not forfeit this claim.

On its merits, however, defendant's claim fails. We have previously rejected confrontation clause challenges to the admission of dying declarations in two cases, *People v. Monterroso* (2004) 34 Cal.4th 743 (*Monterroso*) and *People v. D'Arcy* (2010) 48 Cal.4th 257 (*D'Arcy*). In *Monterroso*, we reviewed the legal principles established in *Crawford v. Washington* (2004) 541 U.S. 36, 56, footnote 6 (*Crawford*), in which the Supreme Court held that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."[9] (*Crawford*, *supra*, 541 U.S. at p. 59.) In *Crawford*, the high court recognized that, historically, the "one deviation" from this rule involves dying declarations, but the court specifically refused to decide "whether the Sixth Amendment incorporates an exception for testimonial dying declarations." (*Id.* at

---

**9** We assume, for sake of argument, that Lopez's statements to the three investigating officers were "testimonial" within the meaning of *Crawford*. (*Crawford*, *supra*, 541 U.S. at p. 51 [discussing, as testimonial, statements that a declarant would reasonably expect to be used in a prosecution]; cf. *Michigan v. Bryant* (2011) 562 U.S. 344, ___ [131 S.Ct. 1143, 1167] [concluding that statements taken from a dying victim by police at crime scene were not testimonial but were taken for the primary purpose of handling an ongoing emergency].)

p. 56, fn. 6.)  While the court had no occasion to specifically consider dying declarations in *Crawford*, it did note that the "existence of that exception as a general rule of criminal hearsay law cannot be disputed." (*Ibid*.)  It further noted, "Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are." (*Ibid*.)  In *Monterroso*, we found that historical common law had permitted the admission of dying declarations, in spite of the right of confrontation.  We concluded, therefore, "that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment." (*Monterroso*, *supra*, at p. 765.)

Defendant urges this court to reconsider our decision in *Monterroso*.  He contends that recent scholarly criticism analyzing the common law basis of the dying declaration exception establishes that it was not a historically unique hearsay exception, and, therefore, the lack of its uniqueness subjects such statements to the demands of the confrontation clause.  But our decision in *Monterroso* did not purport to rely on any asserted historical uniqueness concerning the dying declaration exception to the right of confrontation; rather, we simply recognized that the admissibility of dying declarations was one of " 'those exceptions established at the time of the founding.' " (*Monterroso*, *supra*, 34 Cal.4th at p. 765, quoting *Crawford*, *supra*, 541 U.S. at p. 54.)  Accordingly, even assuming that the dying declaration exception was not a unique hearsay exception at the time the founders drafted the Sixth Amendment, that circumstance does not affect our holding in *Monterroso*.

Defendant further contends that the historical notion of the inherent reliability of dying declarations no longer holds true today because a modern declarant may harbor and articulate self-serving motives under pain of death.  We rejected similar arguments in *D'Arcy*, where this court affirmed its holding in *Monterroso* and again applied the exception regarding the admissibility of testimonial hearsay as a dying declaration. (*D'Arcy*, *supra*, 48 Cal.4th at p. 292.)

30

In the alternative, defendant argues that even assuming the admission of Lopez's statements are not rendered inadmissible by the confrontation clause, this court should find they are inherently unreliable and inadmissible under state and federal guarantees of due process and his Eighth Amendment right to a reliable verdict. Defendant's argument is without merit.

Defendant contends that the belief that a declarant, at the point of death, has no self-serving motives is an unwarranted generalization that is not universally applicable. Defendant cites a federal district court case, contending that it rejected the dying declaration exception as unreliable. It did not. Instead, that court merely expressed its doubt concerning "the inherent reliability of such statements," but concluded that the challenged statements were admissible under an alternative ground and did not make any ruling concerning the application of the dying declaration exception. (*U.S. v. Mayhew* (S.D. Ohio 2005) 380 F.Supp.2d 961, 965, fn. 5.) In any event, although of course we are not bound by the decisions of the lower federal courts (*People v. Avena* (1996) 13 Cal.4th 394, 431), defendant fails to cite a single case concluding that dying declarations are inherently unreliable so as to violate guarantees of due process and a reliable verdict.

Furthermore, specific indicia of reliability are built into Evidence Code section 1242, which codified the dying declaration exception to the hearsay rule. The statute requires that a dying declaration is admissible only if the statement was made upon "*personal knowledge* and under a sense of *immediately impending death*." (Evid. Code, § 1242, italics added.) Each of these elements is satisfied in defendant's case. It was uncontroverted that Lopez's statements about the shooting were from her personal knowledge and concerned the circumstances of her death. The evidence also established that Lopez made her statements under a sense of immediately impending death.

Lopez's statements were properly admitted pursuant to Evidence Code section 1242. We have explained that when evidence is properly admitted under the Evidence Code, there is no violation of due process. (*People v. Merriman* (2014) 60 Cal.4th 1, 67.)

31

Defendant's argument that the general admission of dying declarations violates constitutional and state guarantees of due process and a reliable verdict is without merit.

### B. Motion for mistrial based on witness's comment and the admissibility of a statement made by an investigating officer

Defendant contends the trial court erred by denying his motion for mistrial after a witness unexpectedly referred to codefendant Todd Brightmon as defendant's "henchman." He claims the ruling violated his right to due process and a reliable verdict. In a related claim, defendant also contends the court erred by refusing to redact a portion of codefendant Brightmon's police interview in which the investigating officer stated that he has to get defendant "off the streets." Defendant argues that the officer's statement was irrelevant and inflammatory under Evidence Code section 352 and that its admission in both the guilt and penalty phases violated his rights under the Sixth, Eighth, and Fourteenth Amendments. The court did not err in either ruling.

### 1. *The motion for mistrial*

The prosecution called Alan Ford, who lived in the neighborhood of the Lopez shooting, had seen defendant and Brightmon arrive together, and later heard the gunshot. Ford had been familiar with both defendants and, when asked about the relationship between Brightmon and defendant, Ford replied that Brightmon was defendant's "henchman." Defendants objected, and the trial court granted codefendant Brightmon's motion to strike the answer. Defendants did not ask for a specific instruction informing the jury to disregard the answer, but instead later moved for a mistrial. Defendant contended that the "henchman" comment portrayed him as a criminal leader, but the court denied the motion noting that "everybody was caught off guard."

"We review a ruling denying a motion for mistrial for abuse of discretion." (*People v. Ayala* (2000) 24 Cal.4th 243, 283.) " 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with

32

considerable discretion in ruling on mistrial motions.' " (*People v. Williams* (1997) 16 Cal.4th 153, 211, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 854.)

Defendant argues that the jury could have used the "henchman" comment to infer that defendant had ordered codefendant Brightmon to confess to the Campos murder and testify falsely about the shooting of Lopez. First, the jury had been repeatedly instructed to disregard any evidence that the court ruled inadmissible. The trial court at the beginning of the case, told the jury to disregard an answer if the answer is given before the court rules on an objection and urged the jury to "rise above being basic humans" and "do your best to disregard certain things." Also, before deliberations began, the court instructed the jury to disregard any evidence stricken by the court and to "treat it as though you had never heard of it." We presume the jury followed these admonitions.

Further, any inference that defendant influenced Brightmon to testify falsely in defendant's favor was already strongly supported by other evidence. Brightmon initially told police that he did not shoot Campos. Early on, he was reluctant to confirm defendant's involvement and, instead, blamed the shooting on a man named "Timbuktu." Later, however, Brightmon admitted that defendant was involved. He explained that defendant had put him "under the gun" and that if he did not cooperate with defendant then he "would have been a dead man inside of the trunk" along with Campos. Following their arrest, defendant and Brightmon were housed on the same jail floor and could meet and communicate with each other during the day. Eventually, Brightmon sent a letter to defendant's counsel offering to take responsibility for shooting Campos. Given these circumstances, even without the "henchman" comment, there was a strong inference that defendant had significant influence over Brightmon so as to cause him to testify in defendant's favor.

Accordingly, defendant fails to show that the fleeting reference to "henchman" caused him incurable prejudice.

## 2. *Admission of the investigating officer's statement about the need to apprehend defendant*

As a defense witness, Brightmon testified that he had inadvertently shot Campos during a struggle, and that Oscar Ross demanded that he dispose of Campos or Ross would shoot him. Brightmon testified that he was afraid of Ross. The prosecution impeached Brightmon with the audio recording of his police interview in which he expressed his fear of defendant, not of Ross, while participating in the ambush of Campos. During that interview, the investigating officer made statements about the need to arrest defendant, and the defense unsuccessfully moved to "redact" these statements.

As previously explained, early in the police interview Brightmon refused to acknowledge that defendant was involved in the shooting of Campos, instead identifying a man named "Timbuktu" as the shooter. Later, when the investigating officer accused Brightmon of trying to protect defendant, Brightmon admitted that he felt defendant had put him "under the gun." When the officer clarified that it appeared that Brightmon had participated in ambushing Campos not of his own free will and questioned whether Brightmon felt he could have backed out of participating, Brightmon replied, "Then I would have been a dead man inside of the trunk" along with Campos. In response, the investigating officer repeatedly stated that he had to get defendant "off the streets." Brightmon then asked who else the officer had to get, and the officer again referred to defendant, explaining to Brightmon, "You just said yourself man, you'd be the one in the trunk" if you didn't cooperate and that "obviously" indicates that you had received "some kind of direction, or you have some fear, right?" Brightmon did not express any disagreement with the officer's statements. This portion of the interview was played both at the guilt phase and again during the penalty phase retrial.

Defendant objected to the officer's statements about needing to apprehend defendant, contending that they should be excluded as irrelevant and prejudicial. The prosecutor argued that the officer's statements gave context to the part of the interview

34

where Brightmon expressed fear of defendant, as opposed to Oscar Ross. The trial court weighed the matter under Evidence Code section 352[10] and decided that the statements' probative value as impeachment evidence outweighed any prejudice because it seemed unremarkable that the officer would want to arrest defendant in the belief that he had killed two people.

Evidence is relevant if it tends to prove or disprove any disputed fact or consequence, including evidence relevant to the credibility of a witness. (Evid. Code, § 210; *People v. Kennedy* (2005) 36 Cal.4th 595, 615.) A witness's fear is relevant to his or her credibility, especially when it provides an explanation for conflicting statements by the same witness. (*People v. Burgener*, *supra*, 29 Cal.4th at p. 869.) A trial court's decision to admit or exclude impeachment evidence under Evidence Code section 352 is reviewed for an abuse of discretion. (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

Brightmon's fear of defendant tended to show that his trial testimony accepting responsibility for the shooting was false and influenced by that fear. Brightmon's statement to the officer that he could not back out of participating in the ambush of Campos or else he would have found himself in the trunk was, by itself, ambiguous in that Brightmon did not precisely identify who would have harmed him if he had backed out — Ross, "Timbuktu," or defendant. But the officer's responses about needing to arrest defendant and that defendant would have harmed Brightmon if he had refused to participate clarified that Brightmon was expressing his fear of defendant. Although the officer's belief that defendant should be arrested and removed from the streets was not

---

**10**    Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

35

highly probative, the trial court properly recognized that any prejudice stemming from the officer's belief was minimal because it was unremarkable that a suspect who killed two persons, and might also have killed Brightmon, should be apprehended.

Accordingly, the trial court did not abuse its discretion in refusing to edit Brightmon's police interview in the manner defendant requested.

### C. Admission of photographs

Defendant claims the court erroneously admitted, in both the guilt and penalty phases, autopsy photographs of the victims, a photograph of Campos's body on the side of the road, and a photograph of defendant standing in a lineup. He argues that the photographs were irrelevant, cumulative, and unduly prejudicial in violation of Evidence Code section 352 and of his state and federal constitutional rights to due process, a fair trial, and a reliable capital trial. The trial court properly admitted all of the challenged photographs.

Before trial, defendant made objections to the autopsy photographs of Lopez and Campos, arguing that their causes of death were not in dispute, that the coroner could testify about the injuries using sketches and diagrams, that the photographs were inflammatory, and that some of them were cumulative. Regarding two photographs showing Campos's body on the side of the road, defendant complained that they were gruesome and irrelevant.

The trial court carefully exercised its discretion by choosing not to admit one autopsy photograph of Campos as duplicative of another photograph; it also refused to admit a photograph of Campos's body turned face up on the side of the road because it was "a little bit on the gruesome side." Instead, the court admitted a photograph of the body found facedown on the embankment. In all, the trial court admitted five photographs of Lopez and seven photographs of Campos over defendant's objections.

36

There was no error. The admission of photographs lies within the trial court's discretion and will not be disturbed absent an abuse of that discretion. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1271-1272.) Even if defendant was willing to stipulate to the victims' causes of death, their injuries, or their identities, "[t]he prosecution was not obligated to 'accept antiseptic stipulations in lieu of photographic evidence.' " (*People v. Loker* (2008) 44 Cal.4th 691, 705, quoting *People v. Pride* (1992) 3 Cal.4th 195, 243.) More important, the photographs were relevant to show the conditions of the bodies and the directions of the bullets as indicated by the coroner in the photographs. The photographs depict cleaned wounds showing little blood. The photographs of Campos showing injuries to his face, wrist, and back were relevant to establish that he had been beaten and dragged for purposes of the robbery and kidnapping special circumstances. Last, the picture of Campos's body facedown on an embankment on the side of the road "simply showed what had been done to the victim; the revulsion [it] induce[s] is attributable to the acts done, not to the photograph[]." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1054.) The admission of these photographs of the deceased fell well within the trial court's broad discretion.

Defendant also claims the admission of these photographs was prejudicial at the penalty phase. However, "the penalty phase is an especially appropriate time to introduce photographs showing exactly what the defendant did." (*People v. Rountree* (2013) 56 Cal.4th 823, 852.) "The photographs demonstrated the real life consequences of defendant's crimes and pointedly made clear the circumstances of the offenses . . . ." (*People v. Moon* (2005) 37 Cal.4th 1, 35.)

As for the photograph of defendant standing in a lineup with five other persons, all of whom were wearing handcuffs and orange jumpsuits, the trial court also did not abuse its discretion in admitting this evidence over defendant's objection. Ronald Moore, whose vehicle defendant had commandeered at gunpoint following the Campos shooting, had been shown this photograph to identify defendant as the person who had entered his

37

vehicle. Defendant objected to this photograph as irrelevant and prejudicial because it depicted him wearing an orange prison jumpsuit and handcuffs, but the prosecutor explained that he wanted to use the photograph in his examination of Moore.

The trial court did not abuse its discretion in admitting the lineup photograph. It was relevant to show that all six persons were roughly the same height and build and dressed in the same manner so as to indicate that there was nothing suggestive that resulted in Moore tentatively picking out defendant as the person who was at the scene of the Campos shooting. To the extent the jury could have inferred that defendant had been in custody and was dangerous because of the use of handcuffs, it seems unlikely for the jury not to believe that he was, at some point, in custody and under arrest for his uncontroverted role in the shooting of Lopez while being further investigated for his role in the killing of Campos. There was no error.

### D. Dismissal of the Lopez first degree murder charge

Defendant contends the trial court erred by granting over his objection the prosecutor's request during jury deliberations to dismiss the first degree murder charge in the Lopez case, in the furtherance of justice. The prosecution made the request after the jury sought clarification about the meaning of transferred intent as it applied to first or second degree murder. Defendant argues that the dismissal was improper because it did not follow the proper procedure. He also argues that the court's instruction informing the jury that first degree murder was no longer an option regarding the Lopez killing but was still an option concerning the Campos killing had a coercive effect on jury deliberations. Defendant claims the asserted errors violated his state and federal constitutional rights to a fair trial, due process, and reliable jury verdicts. Although we agree with defendant that the trial court erred in dismissing the first degree murder allegation by not stating the reasons for the dismissal in a minute order, we conclude that neither this error nor the

38

court's additional instruction had any prejudicial or coercive effect on the jury's deliberations.

### 1. Defendant was not prejudiced by dismissal of the first degree murder charge

Section 1385 provides that a judge or magistrate may order an action dismissed "in furtherance of justice." (§ 1385, subd. (a).) In dismissing an action, the court must set forth the reasons for doing so in a minute order. (*Ibid.*) Stating the reasons for dismissal is mandatory, and an order dismissing charges is generally not valid unless it complies with this requirement. (*People v. Orin* (1975) 13 Cal.3d 937, 944-945.) Here, after granting the prosecutor's request to dismiss the first degree murder charge for the Lopez killing, the trial court failed to set forth the reasons for dismissal in a minute order. This was error. Nevertheless, setting forth the reasons for dismissal "is designed to protect the public interest against improper or corrupt dismissals and *is not related to protection of the rights of defendants*." (*People v. Silva* (1965) 236 Cal.App.2d 453, 455, italics added.) "Despite the defective procedure, no harm is done because the prosecutor," who moved for the dismissal, "obviously would not appeal from the order of dismissal." (*People v. Curtiss* (1970) 4 Cal.App.3d 123, 127.) Defendant suffered no prejudice because of this procedural violation.

### 2. The trial court's instruction had no prejudicial or coercive effect

Defendant further claims that the trial court's instructions regarding the dismissal of the first degree charge concerning Lopez's killing (count 2) had a coercive effect on the Campos verdict (count 1). Defendant alleges that the dismissal and additional instructions "highlighted the fact that the court considered the Campos charge to be stronger." The claim is without merit.

Coercion exists where, given the totality of the circumstances, the court's instructions or remarks displaces the independent judgment of the jury " 'in favor of considerations of compromise and expediency.' " (*People v. Breaux* (1991) 1 Cal.4th

281, 319, quoting *People v. Carter* (1968) 68 Cal.2d 810, 817.) Such displacement may occur when the court exerts pressure to reach a verdict, rather than no verdict at all. (*People v. Carter*, *supra*, 68 Cal.2d at p. 817.)

Following the dismissal, the trial court informed the jury, first orally and then in written instructions: "As to Count 2 (Camerina Lopez) only, you are no longer to consider first degree murder. . . . First degree murder on Count 2 (Camerina Lopez) is no longer an issue before you." (Underscoring in original written instruction.) The court further clarified that the previous instructions would continue to apply to count 1, the Campos matter. The jury also received the instruction that "[e]ach count charges a distinct crime. You must decide each Count separately. The defendant may be found guilty or not guilty of either or both of the crimes charged. Your findings as to each Count must be stated in a separate verdict."

We presume the jurors understood and followed the instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Defendant fails to point to any part of the record suggesting that the jury did not follow the instructions. The trial court never indicated a preference for a particular verdict, it did not exert pressure on any juror, nor did it express any exasperation about the jury's deliberations. (*People v. Carter*, *supra*, 68 Cal.2d at pp. 819-820.)

An argument similar to defendant's was raised and rejected in *People v. Bordeaux* (1990) 224 Cal.App.3d 573, 582. The defendant there claimed that dismissal of a first degree murder charge under Penal Code section 1385, with instructions to consider second degree murder, coerced the jury to return a verdict of second degree murder. (*People v. Bordeaux, supra,* at p. 582.) The Court of Appeal held that the dismissal was not coercive and noted that "dismissal of first degree murder under the circumstances here benefits both defendant and the criminal justice system." (*Id.* at p. 582.) Similarly, in the present case, dismissal of the first degree murder charge aided defendant by relieving him of possible capital murder liability for the killing of Lopez.

40

## E.  Instructions on kidnapping

Defendant argues that the kidnapping-murder special-circumstance finding must be set aside because the trial court's instruction provided a definition of simple kidnapping that was incorrect because it was not in effect at the time he committed his crimes.  Despite acknowledging that the jury was correctly instructed on an alternate theory of aggravated kidnapping, he contends that it is not possible to determine whether the jury's verdict rested on the correct legal theory of kidnapping.  (*People v. Morgan* (2007) 42 Cal.4th 593.)  He contends the error violated his federal and state due process rights, as well as his Sixth Amendment right to a trial by jury and his Eighth Amendment right to a reliable verdict.  We conclude that the kidnapping-murder special-circumstance finding must be set aside.

In addition to alleging the robbery-murder special circumstance in connection with the killing of Martin Campos, the People charged a second special circumstance, alleging that defendant had committed that murder during the commission or attempted commission of the crime of kidnapping and kidnapping for purposes of robbery.  The jury was told it could find this kidnapping-murder special circumstance true if it believed defendant had committed a simple kidnapping *or* an aggravated kidnapping based on the intent to rob the victim.  The jury found this special circumstance true, but the verdict form did not specify whether the jury found the special circumstance true based on simple kidnapping or aggravated kidnapping based on the intent to rob the victim.  The parties agree that the jury received a correct definition of aggravating kidnapping but an incorrect definition of simple kidnapping.

In 1995, when the crimes took place against Campos, the law defining simple kidnapping contained an asportation element that focused exclusively on the actual distance the victim was moved.  According to *People v. Caudillo* (1978) 21 Cal.3d 562, 572, 574, (*Caudillo*), " 'the determining factor in the crime of [simple] kidnaping is the actual distance of the victim's movements' " and "[n]either the incidental nature of the

41

movement, the defendant's motivation to escape detection, nor the possible enhancement of danger to the victim resulting from the movement is a factor to be considered in the determination of substantiality of movement for the offense of [simple] kidnaping." Under the *Caudillo* standard, a jury would have to find only that "the movement of the other person was for a substantial distance, that is, a distance more than slight or trivial." (CALJIC No. 9.50 (6th ed. 1996).)

The jury in the present case, however, was given the 1999 revised instruction reflecting this court's overruling of *Caudillo* and replacing the definition of simple kidnapping with a much broader standard. In *People v. Martinez* (1999) 20 Cal.4th 225 (*Martinez*) we overruled *Caudillo* with regard to future cases, and explained it would "be proper for the court to instruct that, in determining whether the movement is ' "substantial in character" ' [citation], the jury should consider the totality of the circumstances." (*Martinez*, *supra*, at p. 237.) Thus, "the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*Ibid*.) The resulting 1999 revised jury instruction, which was given to the jury here, required movement "that is substantial in character," and it further defined that phrase by including the three factors we listed in *Martinez*.[11]

---

[11] The relevant part of the instruction read: "A movement that is only for a slight or trivial distance is not substantial in character. In determining whether a distance that is more than slight or trivial is substantial in character, you should consider the totality of the circumstances attending the movement, including, but not limited to, the actual distance moved, or whether the movement increased the risk of harm above that which existed prior to the movement, or decreased the likelihood of detection, or increased both the danger inherent in a victim's foreseeable attempt to escape and the

*Footnote continued on next page*

Consequently, the trial court gave the jury an erroneous instruction by supplying a 1999 revised definition of simple kidnapping that was not in effect at the time of defendant's crimes and was significantly broader than the previous version of the instruction, which had focused only on how far the victim had been moved.

Further compounding this error, the prosecutor's closing argument did not focus on the distance of the movement, but instead focused on whether defendant's movement of Campos increased the risk of harm. Distance, however, should have been the determinative issue concerning whether a simple kidnapping had occurred because pre-1999 case law established that a movement of 45 feet or less was legally insufficient for purposes of simple kidnapping. (*People v. Morgan*, *supra*, 42 Cal.4th at pp. 612-613.) But in this case, there was scant evidence concerning how far defendant had moved Campos except that he had been moved into the back of a U-Haul truck and then into the trunk of Jose Garcia's vehicle after being shot.[12]

The Attorney General contends that the kidnapping-murder special-circumstance finding need not be set aside because the jury found true the robbery-murder special circumstance. According to the Attorney General, the jury's true finding on the robbery-murder special circumstance indicates that they found the kidnap-murder special circumstance true on the aggravated-kidnapping intent to rob the victim ground and not on the simple kidnap ground. She argues no rational juror, having concluded that the

---

*Footnote continued from previous page*

attacker's enhanced opportunity to commit additional crimes. If an associated crime is involved, the movement also must be more than that which is incidental to the commission of the other crime." (CALJIC No. 9.50 (1999 rev.).)

[12] The evidence showed that Brightmon dragged Campos back to the U-Haul truck, moving him somewhere between 19 and 40 feet.

43

murder was carried out during the commission of a robbery, would have found that the murder was also carried out in the commission of a simple kidnapping. Rather, a rational juror would have found an aggravated kidnapping based on the kidnapping for robbery. Because there was no error concerning the instructions for aggravated kidnapping for purposes of robbery, the Attorney General reasons, the jury's verdict rested on at least one correct legal theory. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1128.) We disagree.

The trial court instructed the jury that, in order to find true the robbery-murder special-circumstance allegation, it had to find that defendant committed the murder to facilitate the crime of robbery. The court further instructed that robbery is the taking of "personal property in the possession of another, against the will and from the person or immediate presence of that person, accomplished by means of force or fear and with the specific intent permanently to deprive that person of the property."

Concerning aggravated kidnapping for purposes of robbery, the trial court correctly instructed the jury that, in order to find the kidnapping-murder special circumstance to be true, the jury had to determine that a robbery had occurred and that the victim had been moved "for a substantial distance where such movement is not merely incidental to the commission of the robbery and where the movement substantially increases the risk of harm to the person moved, over and above that necessarily present in the crime of robbery itself." Thus, the instruction established that an aggravated kidnapping occurs during a robbery if two criteria are met: (1) the defendant moved the victim for a substantial distance; *and* (2) that movement substantially increased the risk of harm for the victim, over and beyond that required for the crime of robbery itself. These two criteria are not part of the definition for robbery murder.

Because the allegation of aggravated kidnapping based on kidnapping to commit robbery has additional elements that are not necessary for robbery-murder, the jury's true finding concerning the robbery-murder special circumstance does not shed light on

44

whether the jury also agreed that the additional elements required for aggravated kidnapping had taken place. In order to make the latter finding, the jury would have to conclude further that defendant moved the victim in a manner that "substantially increased the risk of harm to the person moved, over and above that necessarily present in the crime of robbery itself." (CALJIC No. 9.54 (1998 rev.).) Accordingly, the jury's true finding for the robbery-murder special-circumstance allegation does not also establish the truth of the aggravated kidnapping allegation for purposes of the kidnapping-murder special circumstance.

Nor does the robbery-murder special-circumstance finding foreclose the possibility that the jury concluded that only a simple kidnapping had occurred based on the erroneously given instruction defining simple kidnapping under *Martinez*. Under that erroneously given definition, a simple kidnapping may occur not only when the movement increases the risk of harm, but also when the movement "decreased the likelihood of detection" or "increased both the danger inherent in a victim's foreseeable attempt to escape and the attacker's enhanced opportunity to commit additional crimes." Jose Garcia testified that once they were inside the U-Haul truck, he and Campos were out of sight of anyone else and hidden from view of the street by a large container filled with trash. Thus, the jury could have found that, by ordering Campos into the back of the U-Haul truck, the movement was substantial because it decreased the likelihood of detection by shielding from view the fact that Campos and Garcia were being held at gunpoint. The movement also made it more difficult for them to escape and easier for defendant to assault them. Under the instructions given, therefore, the jury could have found that a simple kidnapping had occurred under the *Martinez* standard, and it did not necessarily also decide whether the movement substantially increased the risk of harm to Campos or Garcia over and above that required for robbery.

Accordingly, although there was a legally correct theory that could have supported the kidnapping-murder special-circumstance finding, the finding must be set aside

45

because we cannot determine on which theory the jury rested its verdict. (See *People v. Morgan*, *supra*, 42 Cal.4th at p. 613 [setting aside kidnap-murder special-circumstance finding because the jury was erroneously instructed under *Martinez, supra*, 20 Cal.4th 225, instead of *Caudillo, supra*, 21 Cal.3d 562].)[13]

### F. Miscellaneous claims

Defendant raises a number of claims that we have previously rejected in other cases. We decline defendant's request to revisit the wisdom of our prior rulings. To that effect:

CALJIC No. 2.52, which instructs the jury that a defendant's flight from the scene of the crime can be used to infer consciousness of guilt, is not unnecessary, argumentative, nor did it permit the jury to draw impermissible inferences about defendant's guilt or state of mind. (*People v. Loker*, *supra*, 44 Cal.4th at p. 706.) The instruction also does not lessen the prosecution's burden of proof even if the identity of the perpetrator is at issue. (*People v. Avila* (2009) 46 Cal.4th 680, 710.)

The trial court did not lack jurisdiction to try defendant for first degree murder because the information charged him with malice murder under section 187 rather than deliberate and premeditated or felony murder under section 189. Defendant received adequate notice that he faced first degree murder charges and special circumstance allegations of burglary, kidnap, and kidnap for robbery because of the evidence presented

---

[13] Given that we set aside the kidnap-murder special circumstance, we need not decide defendant's additional contentions that (1) the trial court prejudicially failed to provide a unanimity instruction to compel the jury to unanimously agree whether a simple kidnap or aggravated kidnapping had occurred and as to which victim, Campos or Garcia; (2) the pre-1999 definition of simple kidnapping was unconstitutionally vague; and (3) there was insufficient evidence of asportation for either simple kidnapping or kidnap for robbery .

at the preliminary hearing. (*People v. Morgan, supra,* 42 Cal.4th at pp. 616-617.) Moreover, the information did not violate his constitutional rights to notice, due process, and trial by jury under *Apprendi v. New Jersey* (2000) 530 U.S. 466. (*People v. Friend* (2009) 47 Cal.4th 1, 54.)

The trial court was not required to instruct the jury to agree unanimously whether defendant had committed a premeditated murder or a first degree felony murder. (*People v. Friend*, *supra*, 47 Cal.4th at p. 54.)

Instructions informing the jury that the court could not accept a guilty verdict on second degree murder unless the jury first unanimously found defendant not guilty of first degree murder, and similarly could not accept a manslaughter verdict without an initial unanimous finding that he was not guilty of first or second degree murder, did not restrain the jury from full consideration of all the evidence and are not unconstitutional. (*People v. Fields* (1996) 13 Cal.4th 289, 309-311.)

## IV. PENALTY PHASE ISSUES

### A. Admission of telephoned threats

Defendant contends the trial court erred by admitting evidence of his telephoned threats to his wife and her boyfriend as evidence in aggravation. Defendant claims the asserted error violated his rights to due process and a reliable verdict and requires reversal of the penalty verdict. We disagree.

While in custody for the present matter, defendant learned his wife was having an extramarital affair, and he made several telephone calls in an effort to stop the relationship. Using the assistance of his friend, Chaka Coleman, defendant called his wife and told her he could blow up the school where she worked if she did not end the affair. He also repeatedly called her boyfriend and, on one occasion, said he could "have something done" to him. Over defendant's objection, the trial court concluded that

47

defendant's conduct constituted threatening telephone calls under section 653m and admitted the testimony.

A violation of section 653m qualifies as a threat of force or violence under section 190.3, factor (b). (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1014.) Defendant argues that his conduct did not amount to a violation of section 653m because he was merely expressing frustration over his wife's affair. At the time of defendant's telephone calls, section 653m stated: "Every person who, with intent to annoy, telephones . . . any threat to inflict injury to the person or property of the person addressed or any member of his or her family, is guilty of a misdemeanor." The statute does not "apply to telephone calls made in good faith."[14] (§ 653m, former subds. (a), (b), amended by Stats. 1993, ch. 589, § 116, p. 3028; see *J.J. v. M.F.* (2014) 223 Cal.App.4th 968, 976 [a mother's repeated telephone calls to the child's father were made in good faith because they concerned the child's health].)

By stating that he could blow up his wife's workplace and that he could "have something done" to her boyfriend, defendant was not acting in good faith by merely discussing his concern about the extramarital affair. Instead, those pronouncements were

---

**14** Because of this good faith exception to the statute, the trial court, in deciding that the telephone threats were admissible aggravating evidence, necessarily concluded that defendant did not act in good faith and had a subjective intent to threaten. (*People v. Boyer* (2006) 38 Cal.4th 412, 477, fn. 51 [a trial court's decision to admit aggravating penalty phase evidence "is reviewed for abuse of discretion, and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient"].) Moreover, there was no instructional error on this issue because, absent a request by counsel, "a trial court has no *sua sponte* duty to instruct the jury as to the elements of all of the other crimes that have been introduced at the penalty phase" and "a defendant who has not requested an instruction on the elements of the alleged other crimes may not complain on appeal." (*People v. Phillips* (1985) 41 Cal.3d 29, 72-73, fn. 25.) Here, defense counsel made no request to instruct the jury on any of the elements of section 653m.

obviously intended to annoy and threaten the recipients in order to generate fear that would force an end to the affair. That both his wife and her boyfriend testified that they did not take defendant's threats seriously does not foreclose application of section 653m because a victim's subjective fear is not a required element of the crime. Moreover, contrary to defendant's assertion, the admission of defendant's telephone statements did not violate his First Amendment right to free speech because section 653m does not prohibit lawful speech in violation of the state and federal Constitutions. (*People v. Hernandez* (1991) 231 Cal.App.3d 1376, 1380 [upholding conviction under section 653m for telephone calls in which the defendant told the victim she would " 'pay' " and was " 'in deep trouble' "].)

Consequently, the trial court did not abuse its discretion in admitting the evidence of defendant's threatening telephone calls because the evidence in question was legally sufficient to constitute violations of section 653m. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 225 [no abuse of discretion where the trial court admitted other crimes evidence at the penalty phase without a preliminary inquiry because the evidence actually presented at trial established the elements of the prior offense].)

### B. Admission of "very lethal" comment

Defendant claims the trial court erred by admitting a prosecution witness's prior statement that she had heard defendant was "very lethal" and not someone to "mess with." He argues that the statement should have been excluded under Evidence Code section 352 and that its admission violated his constitutional rights to due process and a reliable penalty verdict. The court properly admitted the prior statement.

At the penalty phase retrial, Chaka Coleman, testified that she had assisted defendant in setting up several three-way telephone calls between herself, defendant, and his wife's boyfriend, Jarah Smith. During her testimony, Coleman denied previously telling a police detective that defendant said "harsh things" to Smith, that Smith sounded

49

scared, or that she was afraid of defendant. Because it appeared that Coleman was minimizing defendant's conduct concerning Smith, the prosecutor sought to impeach her with her prior statements to the detective, including her comments about defendant having a "very lethal" reputation and being someone not "to mess with." Defendant objected, contending that the prejudicial effect of the prior statement outweighed its probative value, but the trial court overruled the objection and permitted the prosecutor to ask Coleman about the prior statement.

As previously described (*ante*, p. 35), a trial court's decision to admit or exclude impeachment evidence under Evidence Code section 352 is reviewed for an abuse of discretion (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 705); a witness's fear is relevant to his or her credibility and to explain conflicting statements by the same witness. (*People v. Burgener*, *supra*, 29 Cal.4th at p. 869; see also *People v. Eubanks* (2011) 53 Cal.4th 110, 145-146 [trial court did not abuse its discretion in admitting impeachment evidence over the defendant's Evid. Code, § 352 objection].)

Coleman's perceived fear of defendant tended to show that her testimony, which apparently minimized the threatening nature of defendant's telephone calls to Smith, was influenced by her fear of defendant. Moreover, possible prejudice was minimal given the admission of defendant's numerous prior acts of violence. The trial court did not abuse its discretion in admitting Coleman's prior statements.

### C. The shooting of Eric Dawson

Defendant contends the trial court erred by admitting evidence of the shooting of Eric Dawson as aggravation under section 190.3, factor (b) without specifying which particular crime defendant was alleged to have committed in that incident. He claims the error violated his rights to due process and a reliable penalty verdict. There was no error.

As described, *ante*, at page 11, in January 1992, defendant and his associate, Reginald Robinson, were involved in an incident in a motel room involving Anita Smith,

50

her husband, and Eric Dawson. At that time, Dawson suffered a shotgun wound to his arm, but Anita Smith did not see who shot him. Later, Robinson pointed a shotgun at Anita Smith, but defendant intervened and told Robinson not to shoot her. Defendant then slapped Smith in her face and left with Robinson.

Defendant claims the trial court failed to instruct on the specific crime defendant committed in connection with the shooting of Dawson. Because the evidence did not establish who shot Dawson, he contends, the jury could only speculate whether he was the shooter, an aider or abettor to the shooting, or an accessory to the shooting.

We have held that "absent a request, the trial court has no duty to specify the names or elements of the unadjudicated crimes when instructing the jury on factor (b) evidence" because, for tactical reasons, "most defendants prefer not to risk having the jury place undue emphasis on the prior violent crimes." (*People v. Taylor*, *supra*, 48 Cal.4th at p. 656.) In the present case, defendant did not ask the court to enumerate the specific crimes relevant to the shooting of Dawson, and he provides no persuasive reason for us to reconsider our prior precedent on this subject.

### D. Admission of defendant's statement concerning gangs

Defendant contends it was error for the trial court to admit his 1989 statement to a police officer that he had personally expelled members of the Gardena Payback Crips from his Casa Blanca neighborhood. He argues that his statement was not relevant to prove his involvement in the 1989 driveby shooting of a Gardena Payback Crips gang member, and that the admission of his statement violated Evidence Code section 352 and his constitutional rights to due process and a reliable penalty verdict. The statement was properly admitted.

As explained, *ante*, at page 10, the trial court admitted as prior violent crimes evidence the 1989 driveby shooting of Nigel Hider, a member of the Gardena Payback Crips. After being shot, Hider identified defendant as the shooter but told a detective he

51

would not testify in court. A witness to the shooting, Angela McCurdy, described the shooter's appearance as consistent with defendant's appearance but could not definitively identify defendant as the shooter. At the penalty phase retrial, Hider claimed the person who shot him was a Caucasian male, and denied previously having identified defendant as the shooter. Similarly, McCurdy testified that she had not witnessed the shooting and denied ever stating to the contrary.

After the witnesses' testimony, the prosecutor sought to introduce evidence of defendant's prior 1989 statement to a police officer, made approximately one month before the Hider shooting, in which he bragged that "he single-handedly ran the Gardena Payback Crips out of the Casa Blanca area." The prosecutor argued the evidence would prove identity and motive in the Hider shooting. The trial court permitted the admission of this statement over defendant's objection under Evidence Code section 352.

The trial court acted within its discretion in concluding that the probative value of defendant's statement was not substantially outweighed by any undue prejudice. Defendant made the statement approximately one month before Hider was shot and it explained his motive in shooting Hider. Because Hider and McCurdy at trial both denied their previous identifications of the shooter, the issue of identity also became relevant and defendant's statement gave credence to Hider's prior identification of defendant as his attacker. Defendant's statement, therefore, supported the prosecution's theory that defendant intentionally shot Hider in an effort to expel gang members from his neighborhood. (See *People v. Maciel* (2013) 57 Cal.4th 482, 533 [statements relevant to motive were properly admitted to support the theory that the victim was the intended target].)

### E. Claims of instructional error

Defendant raises several unmeritorious claims of instructional error at the penalty phase.

### 1. *CALJIC No. 8.87*

Defendant contends that CALJIC No. 8.87, the standard instruction concerning evidence of other aggravating criminal activity admissible under section 190.3, factor (b), improperly created a mandatory presumption that the activity was criminal in nature instead of having the jury decide whether the conduct constituted a crime. We have previously rejected similar challenges to CALJIC No. 8.87, reasoning that the instruction properly compels the jury to decide the factual question of whether the evidence proved that defendant committed the acts, whereas whether the activity constituted an actual crime or a crime of violence is a legal matter decided by the trial court. (*People v. Gray* (2005) 37 Cal.4th 168, 235; *People v. Nakahara* (2003) 30 Cal.4th 705, 720.)

### 2. *Victim impact*

Defendant claims the trial court had a duty on its own motion to provide the jury with an instruction regarding the appropriate use of victim impact evidence. Although he did not ask for such instructions below, on appeal he proposes that the trial court had a duty to inform jurors that victim impact evidence is "simply another method of informing you about the nature and circumstances of the crime in question," that "the law does not deem the life of one victim more valuable than another; rather, victim impact evidence shows that the victim, like the defendant, is a unique individual," and that the jury is "limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence." The proposed instruction would have also stated that "a victim impact witness is precluded from expressing an opinion on capital punishment and, therefore, jurors must draw no inference whatsoever by a witness's silence in that regard."

We have previously rejected the same argument concerning the same proposed instructional language because the standard instructions provide essentially similar advisements; moreover, some of the proposed instructional language erroneously would

53

preclude a jury from having an emotional response, or is simply unnecessary to the jury's understanding of the case. (*People v. Zamudio* (2008) 43 Cal.4th 327, 369-370.)

### F. Alleged prosecutorial misconduct

Defendant contends the prosecutor committed three instances of misconduct during the penalty phase retrial closing arguments. He argues that the asserted misconduct violated his state and federal constitutional rights to due process, a fair trial, and a reliable penalty verdict. We disagree.

"As at the guilt phase of the trial, at the penalty phase a prosecutor commits misconduct under the federal standard by engaging in conduct that renders the trial so unfair as to constitute a denial of due process. [Citations.] State law characterizes the use of deceptive or reprehensible methods as misconduct." (*People v. Dykes* (2009) 46 Cal.4th 731, 786.)

First, defendant argues it was improper for the prosecutor to make the following statement in closing argument: "The people who know the defendant know enough about him to fear him, and so should you." Defendant objected but the trial court overruled the objection.[15] To the extent that the prosecutor's comments stressed defendant's dangerousness, there was no improper argument.

In *People v. Riggs* (2008) 44 Cal.4th 248, we found no misconduct concerning a similar closing argument emphasizing the defendant's dangerousness. In that case, the

---

[15] The Attorney General argues that defendant forfeited this claim because he did not also ask for a curative admonition. But, logically, the requirement that a defendant also seek a curative instruction to alleviate the effect of improper argument applies only if the court sustains the defense objection as to its impropriety. (*People v. Carter*, *supra*, 36 Cal.4th at p. 1205 ["Defendant's objection having been sustained, defendant bore the burden of seeking a curative admonition from the court"].) Defendant did not forfeit this claim.

defendant had robbed and murdered a young woman after her car broke down on the road. At the penalty phase closing argument, the prosecutor stated: " 'It's really scary what happens out there on our highways. And it's even more scary because we know we got a predator sitting right here in the courtroom with us. It is time that we take control of the situation and do what is right.' " (*Id.* at p. 323.) We concluded that this argument was "not unduly inflammatory." (*Ibid.*)

Similarly, in *People v. Ayala, supra*, 23 Cal.4th 225, we found no misconduct created by the prosecutor's emphasis that witnesses were afraid of the defendant. As in the present case, the prosecutor argued that various witnesses feared the defendant and that their fears affected their testimony. The prosecutor claimed that these witnesses, by testifying, took " 'a substantial risk' " and came forward " 'at great peril to themselves.' " (*Id.* at pp. 286-287.) Again, we concluded that the remarks "were proper argument." (*Id.* at p. 287.)

Defendant relies on *Tucker v. Zant* (11th Cir. 1984) 724 F.2d 882, but it is neither on point nor binding authority. In that case, the prosecutor argued that his office rarely sought the death penalty, based on his personal experience, but that the defendant was " 'not the type of man you're going to want to take a chance on living' " and if executed the prosecutor would " 'sleep just as good, or [he'll] sleep better knowing that one of them won't be on the street.' " (*Id.* at p. 889.) The 11th Circuit Court of Appeals concluded that this argument was improper because the prosecutor had assured the jurors that someone with greater experience had made the decision that defendant deserved death, rather than the jury. (*Ibid.*) Furthermore, whether the prosecutor would sleep better was not relevant and served "only to arouse the generalized fears of the jurors and divert the focus of their attention from the character of this crime and this criminal." (*Ibid.*) The prosecutor here did not personalize his fear or experience, and, in any event, we are not bound by the decisions of the lower federal courts. (*People v. Avena*, *supra*, 13 Cal.4th at p. 431.)

As to the prosecutor's suggestion that *the jury* should fear defendant, this brief comment, even if we assume it was improper, was harmless, as it was not so egregious, deceptive, or reprehensible so as to render his trial unfair.

Second, defendant challenges the method by which the prosecutor discussed defendant's remorse. Prior to closing argument, defense counsel preemptively objected to the prosecutor arguing lack of remorse. The prosecutor acknowledged he could not argue that defendant's lack of remorse was an aggravating factor but observed that the law did permit him to argue that defendant's lack of remorse is nonexistent as a mitigating factor. The trial court agreed and cautioned the prosecutor to exercise care in this regard. During closing argument, the prosecutor explained that the presence of remorse can be a mitigating factor and that its absence cannot be an aggravating factor. He then continued: "But as I said, if he has remorse, it can be considered as mitigating. Is there any sign of remorse here? I'd submit there's none, that there is no mitigation in remorse to be placed on this side of the scale."

Defendant acknowledges that our case law establishes that the prosecutor's argument was proper. But he insists, however, that the argument was improper under the facts of this case because the prosecutor seized upon a matter for which defendant put forth no evidence, thereby violating fundamental fairness and due process. We construe defendant's argument to mean that the prosecutor, in this context, improperly commented on his silence, in violation of *Griffin v. California* (1965) 380 U.S. 609, which holds that a prosecutor's comment on a defendant's failure to testify violates the Fifth Amendment. But we have previously rejected this kind of claim, explaining that the prosecutor simply "noted the lack of evidence and did not refer to defendant's silence" and that "a prosecutor is entitled during closing argument to highlight a defendant's lack of remorse, and doing so does not necessarily violate *Griffin*." (*People v. Brady* (2010) 50 Cal.4th 547, 585.)

56

Third, defendant contends the prosecutor improperly argued that the defense had tried to denigrate the victims by suggesting that "these victims, Martin and Candy, aren't worthy enough." Defendant objected, but the trial court overruled the challenge.[16] The prosecutor then continued, questioning why the defense spent so much time asking questions about Martin Campos's prior drug deals and gun purchases, about the presence of amphetamines in Camerina Lopez's body at the time of her death, and about how Norberto Estrada was drunk and in possession of marijuana when defendant shot him. The prosecutor further argued: "You don't measure the gravity of the defendant's crimes by who he killed. In our society everyone's life has equal value. You don't have to pass a test or reach some kind of threshold of worthiness in order for your special circumstance murder to warrant the most severe sentence."

Contrary to defendant's suggestions on appeal, these comments did not improperly disparage or demean defense counsel. In *People v. Stitely, supra*, 35 Cal.4th 514, 559, the prosecutor during closing argument commented that it was " 'outrageous' " for the defense to attempt to demean the victim. We rejected the claim of misconduct, noting that the comment did "not involve such forbidden prosecutorial tactics as falsely accusing counsel of fabricating a defense or otherwise deceiving the jury." (*Id*. at p. 560.) Instead, the prosecutor had simply criticized "counsel's tactical approach." (*Ibid*.) The same is true here because the prosecutor made a fair inference that the defense had engaged in tactics designed to make the victims appear less sympathetic.

---

[16] The Attorney General again faults defendant for not seeking a curative admonition, but for the same reason we described, *ante*, footnote 15, we conclude defendant did not forfeit this claim.

## G. Erroneous verdict form on death eligibility for Lopez's second degree murder

The parties agree that the verdict form erroneously listed both murders in setting the penalty at death and that the trial court in this case read this erroneous verdict form to the jury before deliberations. Defendant correctly asserts that he cannot be sentenced to death for the second degree murder of Lopez. He further contends, however, that the entire death judgment should be reversed because the error made it likely that the jury returned a verdict of death based only on the relatively tragic nature of Lopez's death. We reject the argument.

The record shows that, at the start of the penalty phase, the trial court told the jury that the defendant had been convicted of first degree murder with one or more special circumstances and that he also had been found guilty of second degree murder "with the further special circumstance of multiple murder." Then, the court stated, "[t]he law of this state is that the penalty for a defendant found guilty of these crimes that I have just outlined shall be death or confinement in state prison for life without the possibility of parole." Before the penalty phase deliberations, the court instructed the jury: "The defendant in this case has been found guilty of one count of murder in the first degree and one count of murder in the second degree" and that "one of the murders was committed under special circumstances and the special circumstances of robbery, kidnapping, and multiple murder have specifically been found to be true" The court then specifically stated: "It is the law of this state that the penalty for a defendant found guilty of murder in the first degree shall be death or imprisonment in the state prison for life without the possibility of parole in any case in which the special circumstances alleged in this case have been found to be true. Under the law of this state, you must now determine which of these two penalties shall be imposed upon the defendant." The jury was given identical written instructions that it could consult during deliberations.

58

Subsequently, however, the trial court read the erroneous verdict form to the jury. The verdict form returning a sentence of death read: "We, the jury in the above-entitled action, as to the defendant, Lumord Johnson, fix the penalty for the murder of Martin Campos and Candy Camerina Lopez as death." The jury returned this form as its verdict, and the court subsequently imposed a sentence of death for both murders. At no point did defendant object to the verdict form, nor did he seek specific clarification when the court polled the jury concerning its verdict.

We agree that the sentence of death as to Lopez must be reversed because such a sentence is not authorized for second degree murder. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1174.) But this error does not require the reversal of the entire penalty phase judgment.

First, defendant has forfeited the issue of whether the technical error in the verdict form improperly biased the penalty verdict "by failing to object to the form of the verdict when the court proposed to submit it or when the jury returned its finding." (*People v. Jones* (2003) 29 Cal.4th 1229, 1259, citing *People v. Bolin* (1998) 18 Cal.4th 297, 330.) When the trial court polled the jury, defendant had the opportunity to clarify any misunderstanding that may have motivated the jury's verdict, but he failed to do so. (See *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 270 [without a timely objection, "a court cannot avoid or cure the defect: after the jury's discharge, the court can neither complete the polling nor return the jury to its deliberations"].) If we were to allow the issue to be raised for the first time on appeal, a party would have an incentive not to complain about the verdict form in the trial court in order to secure the advantage of seeking a complete reversal on appeal. (See *People v. Kennedy*, *supra*, 36 Cal.4th at p. 612 ["the forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error"].)

In any event, the claim fails on its merits.

Although the verdict form was technically inaccurate, the error was harmless. Because one of the two special circumstances that the jury found true was multiple murder, the verdict form was not entirely incorrect to state that defendant was eligible to receive the death penalty considering that he committed *both* murders. " 'Technical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice.' " (*People v. Bolin, supra*, 18 Cal.4th at p. 331.) Here, the jury's intent was unmistakably clear given the applicable law and penalties concerning first degree murder.

Accordingly, we also reject defendant's contention that the inaccurate verdict form amounted to structural error requiring automatic reversal. This is not a situation in which it cannot be fairly determined whether the error affected the jury's verdict. (See *People v. Anzalone* (2013) 56 Cal.4th 545, 554 ["A structural error requires per se reversal because it cannot be fairly determined how a trial would have been resolved if the grave error had not occurred"].) In this particular case, the gap between the correct reading of the verdict form (that the jury was sentencing Johnson for the murder of Campos given the special circumstance that he also murdered Lopez) and the incorrect reading (that the jury was sentencing Johnson for having committed both murders) is so narrow that the error was harmless beyond a reasonable doubt.

## H. Constitutionality of California's death penalty law

Defendant raises a number of constitutional challenges to California's death penalty law, all of which we have repeatedly rejected; defendant offers no persuasive reason to reexamine these prior decisions. Thus, we again hold:

California's death penalty statute adequately narrows the class of death-eligible offenders. (*People v. Watson* (2008) 43 Cal.4th 652, 703.)

60

Section 190.3, factor (a), which allows the jury to consider the circumstances of the crime, does not result in arbitrary or capricious imposition of the death penalty. (*People v. Hamilton* (2009) 45 Cal.4th 863, 960.)

The death penalty law does not require that the jury achieve unanimity regarding aggravating circumstances or that it be instructed on a burden of proof or standard of proof for finding the existence of aggravating factors, finding that aggravating factors outweigh mitigating factors, or finding that death is the appropriate penalty. (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 960.) The United States Supreme Court decisions in *United States v. Booker* (2005) 543 U.S. 220, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, *Apprendi v. New Jersey*, *supra*, 530 U.S. 466, and their progeny, have not altered these conclusions. (*People v. Bunyard* (2009) 45 Cal.4th 836, 858.)

The CALJIC No. 8.88 instruction was not erroneous for describing the jury's task as determining whether the death penalty was warranted, or using the phrase " 'so substantial' " in explaining the process of weighing the aggravating and mitigating factors. (*People v. Parson* (2008) 44 Cal.4th 332, 371.)

The death penalty statute is not deficient by failing to require that the jury be instructed on the presumption of life, nor was there any error because the jury was not so instructed. (*People v. Young* (2005) 34 Cal.4th 1149, 1233.)

There is no requirement for a jury in a capital case to make written findings. (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 960.)

There is no constitutional obligation to instruct the jury to identify which factors are aggravating and which are mitigating, or to instruct the jury to restrict its consideration of evidence in this regard. (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 961.)

The failure to require intercase proportionality review does not render the death penalty law unconstitutional. (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 960; *People v. Watson*, *supra*, 43 Cal.4th at p. 704.)

61

Because we have concluded that capital defendants and noncapital defendants are not similarly situated, the death penalty law does not violate equal protection by denying capital defendants various procedural rights given to noncapital defendants. (*People v. Riggs*, *supra*, 44 Cal.4th at p. 330.)

Last, we reject the claim that the death penalty itself violates international law or international norms or that these norms require the application of the penalty to only the most extraordinary crimes. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 834; *People v. Panah* (2005) 35 Cal.4th 395, 500-501.)

## V. CUMULATIVE ERROR

Defendant argues that reversal of his judgment is necessary because of the cumulative effect of errors in both the guilt and penalty phases of his trial. Regarding the guilt phase, we assumed without deciding that evidence concerning the two killings was not cross-admissible, but nonetheless found that joinder was proper. We also concluded that the kidnapping-murder special-circumstance finding must be set aside because of instructional error. Regarding the penalty phase, we concluded that the prosecutor's brief suggestion that the jury should fear defendant, even if error, was harmless. In addition, although we found that the verdict form listing the second degree murder of Lopez as death penalty eligible was erroneous, we rejected the contention that this error affected the penalty verdict as to the first degree special circumstance murder of Campos. Considered cumulatively, the errors described above do not require reversal of any other part of the judgment.

## VI. DISPOSITION

The kidnapping-murder special-circumstance finding and the death sentence for the second degree murder in count 2 are vacated. In all other respects, the judgment is affirmed.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Johnson

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S105857
**Date Filed:** July 9, 2015

_____

**Court:** Superior
**County:** Riverside
**Judge:** Gordon R. Burkhart


_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Arnold A. Erickson, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Arnold A. Erickson
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607
(510) 267-3300

Ronald A. Jakob
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2332