Filed 6/4/24  P. v. Guerrero CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C097615 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE015402) |
| v. | |
| MARTITSA MARIE GUERRERO et al., | |
| Defendants and Appellants. | |

Defendants Martitsa Marie Guerrero and Martin Chavez appeal their judgments of first degree murder.  They contend the trial court denied them their due process right to notice of the charges against them by sentencing them for premediated murder when the information charged only malice murder.  They also contend the court violated their Sixth Amendment right to confrontation by admitting testimonial hearsay into evidence in the form of the victim's dying declarations.

1

Defendant Chavez further contends that insufficient evidence supports his conviction, and that the trial court erred in not dismissing a one-year weapon enhancement the jury found true.

We affirm the judgments.

FACTS AND HISTORY OF THE PROCEEDINGS

A.     The offense

Shortly after 7:00 a.m. on August 26, 2019, Walnut Grove firefighter Rosa Ventura was called out to a shed fire on Isleton Road. On arriving, she saw a man, later identified as Fabian Costilla, standing next to a firefighter near the burning shed. Smoke was coming off Costilla's body. The only clothing on him was a string from the elastic band of his boxers melted to his skin. Costilla told Ventura in Spanish that he was cold and thirsty, and he kept asking if he was going to die. Another firefighter, Moises Chavez, had Costilla lie down. (We refer to Moises Chavez by his first name to avoid confusing him with defendant Chavez.) Costilla was from Antioch.

Speaking in Spanish, Ventura asked Costilla what happened. Costilla said he had been out with a couple of people, and someone poured gasoline on him and lit him on fire. Ventura told a detective that Costilla said, " 'They threw gasoline on me and set me on fire.' " Asked who did it, Costilla said it was "Junior" Chavez, a man from Pittsburg who came out there with him. Costilla described Chavez as a big, tall, chunky man with big, curly hair and a beard. Chavez was wearing an ankle monitor.

Costilla also said that Martitsa Guerrero participated with Chavez in pouring the gas and setting him on fire. She, too, was from Pittsburg. She had dark long hair and glasses. He said the three got into an altercation. He told Ventura, "That fucking bitch comes around me, but I don't pay attention to her." Ventura asked him if Guerrero was his girlfriend, and he said she was not. He did not want to be with her.

2

Ventura noticed that Costilla's pupils were "pinpoint." Pinpoint pupils indicated Costilla was on some sort of substance. They could also indicate he was under stress. Ventura asked him if he was sure it was Junior and Guerrero. He said he was sure. He saw them do it. He told Ventura that Junior and Guerrero were in a white Ford F-150.

Firefighter Moises testified that when asked what had happened, Costilla said "they" did not like him. He said the male perpetrator had tattoos on his face and a big belly. He was with a woman, and they were using a white truck. Costilla used the term "they" quite a lot. Moises told another deputy that Costilla said, " 'They lit me on fire. They hate me, they hate me.' "

Moises said he sometimes could not understand Costilla because he would scream in pain. Ventura said Costilla appeared to be in excruciating pain and shock. He was in and out of consciousness. At times, she talked to him to keep him from drifting off. The two firefighters were with Costilla for about 15 minutes before he was airlifted to a hospital. He died later that day.

B.     Investigation

Defendant Chavez was on parole at the time of the crime. One of his conditions of parole required him to wear an ankle monitor 24 hours a day. The monitor had a GPS device affixed to it. Chavez's parole agent testified the ankle monitor showed that Chavez had been at the location of the shed fire between 7:17 and 7:24 a.m. on August 26, 2019. At approximately 7:43 a.m. that day, the parole agent received a "master tamper" notification indicating that Chavez's ankle monitor had been tampered with and rendered inoperable on Isleton Road by the Sacramento River.

That morning, Detective Robert Peters located a disabled white Ford pickup off Isleton Road about 100 to 150 yards south of the fire scene. The pickup was an extra cab truck. Unlike a full quad cab with four doors, the pickup had three doors, with the third

3

door opening to the rear cargo area and seat on the passenger side. Around the pickup, Detective Peters also found a pair of size 31 waist jeans and a ribbed tank top shirt.

Inside the truck, investigators found a pair of bolt cutters. At the gate to the property where the fire occurred, Detective Peters located a Master Lock on the ground that had been cut as well as the severed loop portion of the lock. The bolt cutters in the pickup were capable of cutting that particular size and type of lock.

Investigators also found a knife underneath the driver's seat on the floorboard of the pickup's rear passenger compartment. The knife was stainless steel, and the blade was approximately three and a half inches long. Also in the truck's rear compartment, investigators found two pairs of scissors, a neon green shirt commonly worn by construction workers with a reflective strip on the back, and a blue nylon- or polyester-type polo shirt. The back of the blue shirt appeared to have dried blood on it, and its rear left shoulder had two puncture marks. A yellow Bic lighter was located on the middle of the front seat. Costilla's phone was found inside the truck.

Working off of a tip that afternoon, Detective Peters and a deputy drove south along the river road. About a mile and a half south of the crime scene, they located Chavez, defendant Guerrero, and another individual, Miguel Gallegos, walking together. Each was soaking wet. Chavez was not wearing an ankle monitor. The officers detained the three individuals but subsequently released Gallegos.

Detective Glen Petree obtained surveillance video from a market, Delta Food and Fuel, that was filmed the morning of the crime. The tape depicted a white Ford pickup pull up to the gas pumps just after 7:00 a.m. The pickup was the same truck with the same license plate number as the disabled truck Detective Peters had located. The video records Guerrero getting out of the truck's driver's side and walking into the store. Gallegos, wearing a green neon shirt, got out of the front passenger side. A minute or so later, he opened the rear passenger door, and Chavez got out of the truck. The two stood by the truck until Guerrero came back and began filling the truck with gas. Gallegos let

4

Chavez back into the back seat, and he brought out a green plastic container. Guerrero put gas into the container, then Gallego put it into the pickup's bed and got in the truck. Guerrero finished putting gas in the truck, got in, and drove away.

Phone records indicated that Guerrero's and Costilla's phones had exchanged four calls around 3:00 a.m. the morning of the crime. At that time, both phones were located in the Antioch area. Immediately after those calls, Costilla's phone stopped connecting to cell towers and appeared not to be functioning. At 5:24 a.m., Guerrero's phone had moved to near the interchange of Highways 4 and 160 west of Oakley. At 7:28 a.m., Guerrero's phone connected with a cell tower in Ryde near the crime scene.

Gallegos's phone had a contact for "Maritza (verbatim)," but it did not have a contact for Chavez. Costilla's phone had a contact labeled "Maritza (verbatim) Guerrero." It also contained a photograph of Guerrero.

Detective Petree obtained a photograph from Costilla's Facebook account that depicted Guerrero and Costilla standing next to each other inside a room. In the photo, Costilla's left arm is around Guerrero's back and his left hand is on her left shoulder. Guerrero is smiling in the photo.

C. Autopsy

A forensic pathologist determined that Costilla died from thermal injuries and smoke inhalation. Thermal injuries refer to burning and contact with high temperature things. Approximately 99 percent of Costilla's body was burned. Costilla suffered two stab wounds in his upper left back. One of the wounds measured four and one-third inches deep and approximately one-half inch wide. Costilla also suffered a subcutaneous hemorrhage of the skull potentially caused by blunt force trauma.

D. Defense

Chavez testified on his own behalf. He denied killing Costilla. He claimed Gallegos did it and that he did not help Gallegos in any way. At the crime scene, he was

5

looking for things to steal when he heard someone screaming. He went back and saw Costilla on fire and Gallegos putting something in the back of the truck. He screamed at Gallegos, asking him what had happened, but he did not remember anything after that.

Clinical psychologist Laeeq Evered evaluated Chavez in April of 2022. Dr. Evered determined that Chavez suffers from an intellectual disability. The disability impaired his global functioning and made it difficult for him to understand and process information. The more emotional the situation, the more likely he would act in an impulsive manner and not think through consequences.

Blood taken from Costilla at 8:50 a.m. the day of the crime and before he died indicated the presence of methamphetamine and amphetamine. Blood taken from Guerrero and Chavez after their arrests indicated the presence of methamphetamine in both individuals, but in lesser amounts than Costilla, although his blood was tested several hours earlier.

Guerrero introduced no evidence.

E. <u>Verdicts</u> <u>and</u> <u>sentences</u>

A jury found Chavez and Guerrero guilty of first degree murder. (Pen. Code, § 187, subd. (a) [unless otherwise stated, statutory section citations are to the Penal Code].) It also found true an allegation that both defendants used gasoline, a deadly weapon. (§ 12022, subd. (b)(1).) In a bifurcated proceeding, the trial court found that Chavez had committed a prior serious felony for purposes of the Three Strikes Law. (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d).)

The trial court sentenced Chavez to state prison for 51 years to life: 25 years to life for the murder, doubled for the strike prior, plus one year for the weapon enhancement. The court sentenced Guerrero to state prison for 26 years to life: 25 years to life for the murder plus one year for the weapon enhancement.

6

DISCUSSION

I

*Notice of Premeditated Murder Charge*

Under California law, a murder charge under section 187 "places the defense on notice of, and allows trial and conviction on, all degrees and theories of murder[.]" (*People v. Contreras* (2013) 58 Cal.4th 123, 149 (*Contreras*).)  An accusatory pleading charging malice murder supports a conviction of first degree murder, including one based on a theory of premeditation.  (*People v. Jones* (2013) 57 Cal.4th 899, 968.)

Defendants contend the California rule violates their due process right to notice of the charges against them guaranteed by the Sixth Amendment and as interpreted in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*).)  The information alleged malice murder under section 187 without also alleging the prosecution was pursuing a theory of premeditation.  Without objection, the trial court instructed the jury on first degree murder, and the jury found defendants guilty of that crime.  They contend the lack of notice of being prosecuted specifically for premediated murder violated their due process rights, the California rule notwithstanding.

Defendants concede that the California Supreme Court has long rejected their arguments.  A charge of malice murder under section 187 does not violate the Sixth Amendment if it does not allege the degree or theory of malice murder on which the defendant is tried and convicted.  " 'Similar claims—whether framed in terms of a lack of jurisdiction, inadequate notice, erroneous instruction, insufficient proof, or the absence of jury unanimity—have been rejected before. . . .  [O]ur cases have long made clear that an accusatory pleading charging malice murder supports conviction of first degree murder,' whether on a felony-murder or premeditation theory." (*People v. Chhoun* (2021) 11 Cal.5th 1, 40 (*Chhoun*), quoting *Contreras, supra*, 58 Cal.4th at p. 147; see *People v. Wright* (2021) 12 Cal.5th 419, 454; *People v. Sattiewhite* (2014) 59 Cal.4th 446, 473-474;

7

*People v. Friend* (2009) 47 Cal.4th 1, 54.)  "[A] charge of murder not specifying the degree is sufficient to charge murder in any degree.  The information also need not specify the theory of murder on which the prosecution relies at trial."  (*Contreras,* at p. 147.)

The California Supreme Court has also rejected defendants' argument under *Apprendi*.  (*Chhoun, supra*, 11 Cal.5th at pp. 40-41.)  The *Apprendi* court stated that facts (other than prior convictions) which increase a crime's statutory maximum punishment must be charged in the accusatory pleading, submitted to a jury, and proven beyond a reasonable doubt.  (*Apprendi, supra*, 530 U.S. at p. 476.)  Such facts are those which are the functional equivalent of an element of a greater offense.  (*Id*. at p. 494, fn. 19.)

The California Supreme Court has held that "*Apprendi's* requirements for how element-like sentencing factors must be *proved* and *found* create no 'new notice requirements for alternative *theories* of a substantive offense such as a theory of first degree murder.' "  (*Contreras, supra*, 58 Cal.4th at p. 149, quoting *People v. Abel* (2012) 53 Cal.4th 891, 938.)  Thus, *Apprendi* does not affect the California rule that a charge under section 187 for malice murder places the defense on notice of, and allows trial and conviction on, all degrees and theories of murder.  (*Contreras*, at p. 149.)

We are bound to follow the California Supreme Court's decisions.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*).)  Defendants recognize this and concede they raise the issue to preserve it for further review.  Following *Contreras*, we reject defendants' due process claims of lack of notice of the charges against them.

II

*Admission of Costilla's Dying Declarations*

The Sixth Amendment's confrontation clause prohibits admitting testimonial hearsay as evidence unless the speaker is unavailable to testify and there was a prior

opportunity for cross-examination. (*Crawford v. Washington* (2004) 541 U.S. 36, 68 (*Crawford*).) However, the *Crawford* court stated that, historically, one deviation from this rule in a criminal case involved dying declarations. (*Id*. at p. 56, fn. 6.) At the time of the founding, dying declarations were excepted from the hearsay rule under common law, and authority existed for admitting testimonial dying declarations. (*Ibid*.) *Crawford*, though, did not decide whether the Sixth Amendment incorporated an exception for testimonial dying declarations. (*Ibid*.)

The California Supreme Court has expressly held that the confrontation clause incorporates an exception for dying declarations which are admissible under Evidence Code section 1242. (*People v. Monterroso* (2004) 34 Cal.4th 743, 763-765 (*Monterroso*).) "[I]f, as *Crawford* teaches, the confrontation clause 'is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding' (*Crawford, supra,* [541 U.S. at p. 54]), it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment." (*Monterroso*, at p. 765; see *People v. Johnson* (2015) 61 Cal.4th 734, 760-762, fn. 9 [*Monterroso* applies to testimonial dying declarations].)

Defendants contend the trial court erred by admitting Ventura's and Moises's testimony of Costilla's statements as dying declarations. They argue that *Monterroso* was wrongly decided. They argue *Crawford* prohibits admitting all testimonial hearsay that was not subject to cross-examination, and despite that case's interpretation of the confrontation clause, historical grounds alone as relied on by *Monterroso* do not resolve the issue of admitting testimonial dying declarations. Costilla's statements to Ventura and Moises were testimonial and were not previously subject to cross-examination. Thus, defendants argue, their admission violated the confrontation clause as constructed in *Crawford*.

9

Defendants acknowledge that *Monterroso* is binding on this court. (*Auto Equity Sales, supra*, 57 Cal.2d at p. 455.) They raise the issue to preserve it for federal review. Given *Monterroso*, we conclude the trial court did not err by admitting Ventura's and Moises's testimony of Costilla's statements as dying declarations. Whether or not the statements were testimonial, under *Monterroso* the confrontation clause did not bar the admission of Costilla's dying declarations.

III

*Sufficiency of Evidence Supporting Chavez's Murder Conviction*

Defendant Chavez contends insufficient evidence supports his conviction of first degree murder, whether as a direct perpetrator or as an aider and abettor.

When we consider the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence from which any reasonable and rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*Ibid*.)

We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Edwards, supra*, 57 Cal.4th at p. 715.) We do not resolve credibility issues or evidentiary conflicts. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) It is the exclusive province of the trier of fact to determine a witness's credibility and the truth or falsity of the facts upon which a determination depends. (*Ibid*.)

We will not reverse a judgment for insufficient evidence " 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio, supra*, 43 Cal.4th at p. 357.) Where the evidence reasonably justifies the trier of fact's findings, our belief that the evidence might also

10

reasonably justify a contrary finding does not warrant reversing the judgment. (*Id*. at p. 358.)

Substantial evidence supports Chavez's conviction. Costilla identified Chavez by name as the person or one of the persons who poured gasoline on him and set him on fire. Costilla accurately stated where Chavez was from, and that Guerrero was with him at the time of the crime. Costilla also gave an accurate physical description of Chavez as a large man with curly hair and beard who was wearing an ankle monitor. Chavez's ankle monitor showed that Chavez was at the crime scene at the approximate time of the murder. The ankle monitor was removed and rendered inoperable minutes after the murder near the crime scene.

The surveillance video depicted Chavez as a passenger in the white Ford truck with Guerrero and Gallegos minutes before the murder which was later found along Isleton Road south of the crime scene, and which contained Costilla's phone. The video showed Guerrero pour gasoline into a green container which Gallegos put inside the truck's bed while Chavez was inside the truck. Officers found Chavez with Guerrero and Gallegos walking along the river south of the crime scene. Chavez was missing his ankle monitor. This was ample evidence from which a rational juror could find Chavez guilty of first degree murder beyond a reasonable doubt.

Chavez does not dispute that Costilla's killing was first degree murder. He argues there was no substantial evidence that he poured or ignited the gasoline. He acknowledges Ventura's testimony that Costilla identified him as the perpetrator, but he argues that Ventura's testimony was not substantial evidence because it was impeached on cross-examination due to her lack of memory, her uncertainty of understanding Costilla and translating his Spanish, and her uncertainty of whether Costilla's references to "they" referred to one or more than one person. According to Chavez, Moises's testimony suffered from the same ambiguities.

11

Chavez asserts that Costilla's uncertain use of "they," whether referring to one person or more than one person, raises too many questions and possibilities of what Costilla meant by that term for the jury to conclude that Chavez was a perpetrator. He contends that under these circumstances, Costilla's dying declarations were too uncertain and vague to constitute substantial evidence, and there was no other evidence that he was the perpetrator.

Chavez essentially asks us to interpret and construct Ventura's and Moises's words and evaluate contradictions and weaknesses in their testimony—in effect, to engage in factfinding. That is not our role. The firefighters' testimony of Costilla's dying declarations was substantial evidence that Chavez was the perpetrator. That the impeachment of that evidence could lead a reasonable juror or this court to conclude differently than the jury reasonably did does not warrant reversal. Because substantial evidence supports the jury's determination that Chavez was the perpetrator, we need not address his contention regarding the sufficiency of the evidence that he aided and abetted the murder.

IV

*Weapon Use Enhancement*

With an exception not relevant here, section 1385 requires a trial court to dismiss an enhancement "if it is in the furtherance of justice to do so[.]" (§ 1385, subd. (c)(1); Stats. 2021, ch. 721 (Sen. Bill No. 81), § 1.) In exercising its discretion under this statute, the trial court must consider and afford great weight to evidence offered by the defendant to prove any of the mitigating circumstances the statute provides. (§ 1385, subd. (c)(2).) One mitigating circumstance relevant here reads: "The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed." (§ 1385, subd. (c)(2)(C).) The presence of this circumstance weighs greatly in favor of dismissing the enhancement "unless the court

12

finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2).)

Chavez contends the trial court violated section 1385 by not dismissing his one-year weapon enhancement imposed under section 12022, subdivision (b)(1). He asserts section 1385 mandated the court to dismiss the enhancement—because the enhancement resulted in an aggregate sentence of over 20 years—unless the court found that the dismissal would endanger public safety. The court did not make that finding and, Chavez argues, it could not have done so under the circumstances. As a result, the court was required to dismiss the enhancement.

The Attorney General contends that Chavez forfeited this claim by not seeking to have the enhancement dismissed at trial. Chavez concedes his trial counsel did not object to the enhancement. But he argues the trial court's imposition of the enhancement in violation of section 1385 resulted in an unauthorized sentence. An appellate court may correct an unauthorized sentence despite the absence of an objection by either party in the trial court. (*In re Sheena K.* (2007) 40 Cal.4th 875, 882, fn. 3.)

Chavez has forfeited this argument. Although an unauthorized sentence may be challenged on appeal where no objection was raised in the trial court, Chavez does not establish that the enhancement was in fact an unauthorized sentence. The "unauthorized sentence" concept is a narrow exception to the general requirement that only those claims properly raised and preserved at trial are reviewable on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 354.) Generally, a sentence is unauthorized "where it could not lawfully be imposed under any circumstance in the particular case." (*Ibid*.) Chavez argues in effect that the trial court could have imposed the enhancement if it had found that not imposing it would endanger public safety. Because Chavez concedes the court could have imposed the enhancement under a certain circumstance, the sentence is not an unauthorized sentence. As a result, Chavez's not objecting to the enhancement at trial forfeits the argument here.

13

We are alert to the fact that there are a number of appeals pending in the California Supreme Court regarding the proper interpretation of section 1385.  (See, e.g., *People v. Mazur* (2023) 97 Cal.App.5th 438, 446-447, review granted Feb. 14, 2024, S283229; *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1096-1098, review granted Apr. 12, 2023, S278894; *People v. Walker* (2022) 86 Cal.App.5th 386, 398-399, review granted Mar. 22, 2023, S278309) and that appeals decided in other districts of the Court of Appeal have touched on the issue as well.  (See, e.g., *People v. Mendoza* (2023) 88 Cal.App.5th 287; *People v. Anderson* (2023) 88 Cal.App.5th 233, review granted Apr. 19, 2023, S278786.)  We have considered each of those cases in reaching our decision here.

## DISPOSITION

The judgments are affirmed.

_____

HULL, Acting P. J.

We concur:

_____

RENNER, J.

_____

FEINBERG, J.